AIRCRAFT & DIESEL EQUIPMENT CORP. *v.*
HIRSCH ET AL.

No. 95.  Argued January 15, 1947.—Decided June 16, 1947.

*Arthur R. Hall* argued the cause for appellant. With him on the brief were *Earl B. Wilkinson, Francis W. Hill, Jr.* and *J. Alfred Moran.*

*Robert L. Stern* argued the cause for appellees. With him on the brief were *Acting Solicitor General Washington, Assistant Attorney General Sonnett, Paul A. Sweeney* and *Ray B. Houston.*

MR. JUSTICE RUTLEDGE delivered the opinion of the Court.

This case is the fourth in a series seeking here a determination of the invalidity, on constitutional grounds, of the First and Second Renegotiation Acts [1] and allied legislation.

In *Coffman* v. *Breeze Corporations,* 323 U. S. 316, and in *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129, the Royalty Adjustment Act [2] was attacked. The *Alma Motor* case was remanded to the Circuit Court of Appeals for a determination of the Act's applicability. The suit in the *Coffman* case was by a patent owner to restrain his licensees from paying accrued royalties to the Government pursuant to the Act's provisions. We held

---

[1] The First Renegotiation Act was contained in § 403 of the Sixth Supplemental National Defense Appropriation Act, 56 Stat. 226, as amended 56 Stat. 798, 982, 57 Stat. 347, 57 Stat. 564. The Second Renegotiation Act appears in the 1943 Revenue Act. 58 Stat. 21, 78, as amended 59 Stat. 294.

[2] Of October 31, 1942, 56 Stat. 1013, 35 U. S. C. (Supp. V, 1946) §§ 89–96.

that the complaint had been rightly dismissed for want of equity jurisdiction, since the plaintiff had an adequate remedy at law by suit against its licensees, and also for want of a justiciable case or controversy.

In *Mine Safety Co.* v. *Forrestal,* 326 U. S. 371, a government contractor challenged the Renegotiation Acts.[3] The complaint sought to enjoin the Secretary of the Navy from taking action "which would stop payment by the government of money lawfully in the United States Treasury to satisfy the government's and not the Secretary's debt to the appellant." 326 U. S. at 374. Accordingly we held that the Government was an indispensable party. Since it neither had been joined in the suit nor had consented to be sued in such a proceeding, it followed that the complaint had been properly dismissed.

In one other case, *Macauley* v. *Waterman S. S. Corp.,* 327 U. S. 540, constitutionality was not involved, but coverage of the Renegotiation Acts was put in issue. The suit was brought in a District Court for a declaratory judgment and to restrain further renegotiation proceedings affecting the specified contracts. The contractor had not sought a decision on coverage from the Tax Court. We held that the Tax Court has power to decide such questions in the proceedings authorized by § 403 (e) (1) of the Second Renegotiation Act. Hence, under the authority of *Myers* v. *Bethlehem Shipbuilding Corp.,* 303 U. S. 41, the complaint in the *Waterman* case also was held rightly to have been dismissed, in this instance for the plaintiff's failure to exhaust its administrative remedy.

Now the Aircraft & Diesel Equipment Corporation seeks a declaratory judgment that the First and Second Renegotiation Acts are unconstitutional on various grounds. Injunctive relief also is asked. And, in addi-

[3] See note 1.

tion to the constitutional questions, determination is sought of issues of coverage and other matters.

The defendants, appellees here, consist of the members of the War Contracts Price Adjustment Board, the Secretary of War, and the Under Secretary of War.[4]  Pursuant to the statutory requirement, 50 Stat. 751, 752, 28 U. S. C. § 380 (a), a district court of three judges was especially convened.  After hearing, the complaint was dismissed.[5]  One ground for this action was that the suit is premature, since proceedings were pending and undetermined in the Tax Court, pursuant to appellant's applications, for redetermination of its allegedly excessive profits for 1942 and 1943.[6]  The court also held that it was without jurisdiction in equity, since in its view adequate remedy at law was available to Aircraft.  Probable jurisdiction of the appeal was duly noted here.[7]

We think the District Court correctly dismissed the complaint, and for the reasons stated as grounding its action.  The issues expansively include almost all comprehended in the causes previously determined here.  But the case reaches this Court in a posture differing in some sub-

---

[4] The War Contracts Price Adjustment Board is created by § 403 (d) (1) of the Second Renegotiation Act, 50 U. S. C. App. (Supp. V, 1946) § 1191 (d) (1).  The present appellees were substituted by an order of the District Court as successors in office of the original defendants.

[5] 62 F. Supp. 520.

[6] See note 9.  The Tax Court proceedings remain pending and undetermined at the date of this decision.

[7] On appellant's application the District Court enjoined the defendants, pending determination of the appeal, from taking further action to enforce the statutes, particularly by notifying or requiring appellant's customers to pay into the Treasury of the United States moneys alleged to be due Aircraft under contract provisions, but claimed by appellees to be payable to the Government as excessive profits pursuant to the Acts' terms.  Cf. notes 10, 13 infra.

stantial respects from that characterizing any of those proceedings. Hence it becomes necessary to set forth with some particularity the facts and controlling issues.

## I.

Appellant is in the business of manufacturing diesel fuel injection equipment and precision parts, and aircraft precision parts. Its manufacturing activities, insofar as material,[8] were carried on under subcontracts with government contractors. The contractor in turn furnished the completed aircraft or engines to the United States.

Pursuant to the First Renegotiation Act, the Secretary of War, acting through his delegate the Under Secretary of War, determined on October 27, 1943, that during the fiscal year ended November 30, 1942, appellant had realized excessive profits (less tax credits) amounting to $204,000. On April 29, 1944, the Under Secretary directed appellant's customers to withhold this sum from appellant. Thereafter it filed a petition with the Tax Court[9] for a redetermination of the alleged excessive

---

[8] The amended complaint alleges that appellant supplied materials to the Department of the Navy under one contract made directly between it and the Government. But it is also alleged that appellant has been paid in full for these supplies. Apparently, therefore, the contract and the relation which it created between appellant and the Government have no bearing upon the issues in this cause.

[9] The First Renegotiation Act did not provide for redetermination by the Tax Court as originally enacted; nor did it specifically provide for review, by any body, of the determination of excessive profits. See Steadman, A Further Legal Inquiry Into Renegotiation: I (1944) 43 Mich. L. Rev. 1, 12. But Tax Court redetermination was afforded by the Second Renegotiation Act and was made retroactive. 50 U. S. C. App. (Supp. V, 1946) § 1191 (e) (2) provides that it is available to "Any contractor or subcontractor . . . aggrieved by a determination of the Secretary made prior to the date of enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943, as to the existence of excess profits . . . ."

profits. Nevertheless, on July 19, 1944, the Under Secretary further directed appellant's customers to pay the $204,000 into the Treasury of the United States, and this direction was obeyed.[10]

Following the fiscal year ended November 30, 1943, renegotiation proceedings were instituted under the Second Renegotiation Act. On January 11, 1945, the Under Secretary of War, as delegate of the War Contracts Price Adjustment Board, entered an order determining that appellant had realized excessive profits of $1,265,000. Deduction of tax credits reduced this amount to approximately $270,000. Appellant again filed a petition for redetermination with the Tax Court.[11] Then followed this suit.

The amended complaint is too lengthy for detailed summarization in this opinion. Apart from allegations going to constitutionality and coverage, including asserted defects in the renegotiation procedures followed,[12] the

---

[10] The original Act, as amended, provided: "Upon renegotiation, the Secretary is authorized and directed to eliminate any excessive profits under such contract or subcontract . . . (iii) by directing a contractor to withhold for the account of the United States, from amounts otherwise due to the subcontractor, any amount of such excessive profits under the subcontract . . . ." 56 Stat. at 983. See also note 13.

[11] An earlier petition was dismissed on motion of the United States because it was filed during the time when the War Contracts Price Adjustment Board might have initiated a review. Cf. *Macauley* v. *Waterman S. S. Corp.*, 327 U. S. 540. After dismissal of the earlier petition and before filing of the later one, appellant had sought redetermination, pursuant to § 403 (e) (1) of the Second Renegotiation Act, by the War Contracts Price Adjustment Board. The Board denied review and adopted the Under Secretary's redetermination as its own.

[12] For example, in addition to contentions that the Renegotiation Acts as a matter of substantive law violate Article I, § 1, of the Constitution in that they constitute unlawful delegations of legislative power as well as contravene the due process and just compensation

complaint sought to establish jurisdiction in the District Court, equitable in character, by showing the inadequacy of all available legal or other remedies. These included the pending Tax Court proceedings, possible suit in the Court of Claims following completion of the Tax Court's determination, and actions at law against appellant's customers, contractors with the Government, to recover the amounts said to be due under their various contracts.

In particular it was alleged that, notwithstanding the pendency of the Tax Court proceedings, the Board and the Secretary, or his delegates, were taking steps to prevent Aircraft's customers from paying over to it moneys owing on contracts, aggregating $270,000, and claimed to be due the Government as excessive profits. The complaint alleged further that the Board and the Secretary were threatening to direct Aircraft's customers to pay these sums into the Treasury [13] and that, unless they were re-

provisions of the Fifth Amendment, the jury trial provision of the Seventh Amendment, and the Tenth Amendment, it is said that the order under the Second Renegotiation Act was based in part at least on information said to have been obtained from "governmental and other reliable sources" which the appellant has had no opportunity to examine or rebut.

[13] Section 403 (c) (2) of the Second Renegotiation Act, 50 U. S. C. App. (Supp. V, 1946) § 1191 (c) (2), provides: "Upon the making of an agreement, or the entry of an order, under paragraph (1) by the Board, or the entry of an order under subsection (e) by The Tax Court of the United States, determining excessive profits, the Board shall forthwith authorize and direct the Secretaries or any of them to eliminate such excessive profits (A) by reductions in the amounts otherwise payable to the contractor under contracts with the Departments, or by other revision of their terms; or (B) by withholding from amounts otherwise due to the contractor any amount of such excessive profits; or (C) by directing a contractor to withhold for the account of the United States, from amounts otherwise due to a subcontractor, any amount of such excessive profits of such subcontractor; or (D) by recovery from the contractor, through repayment, credit, or suit any amount of such excessive profits actually paid to him; or (E) by any combination of these methods, as is deemed desirable. . . ."

strained, such payment would be made, to appellant's irreparable injury.[14] No direct relief was asked, by way of judgment or decree, for refund of the $204,000 collected by the Government from appellant's customers, pursuant to the First Renegotiation Act, as excessive profits realized in 1942. It was suggested, however, that if that Act should be found invalid and the Second Act sustained,[15] the Government should be permitted to collect only the difference between $270,000, the amount determined to be excessive profits for 1943, and the $204,000 collected for 1942. The suggestion, of course, if formally

[14] The allegations included the following: "Notwithstanding the fact that the plaintiff has filed its petition for redetermination in The Tax Court of the United States whereby it seeks an orderly determination of the amount, if any, it may owe to the United States of America, as excessive profits for its fiscal year ending November 30, 1943, the War Contracts Price Adjustment Board, purporting to act under the provisions of Section 403 (c) (2) of the Renegotiation Act, purposes to direct the defendant Henry L. Stimson, Secretary of War, or his delegates, to direct contractors, customers of the plaintiff, to withhold moneys due to the plaintiff by such contractors for the account of the United States, in amounts determined by it, the War Contracts Price Adjustment Board, to be due as excessive profits, and Henry L. Stimson, Secretary of War, or his delegates purposes to follow such directions of the War Contracts Price Adjustment Board and further to direct such contractors to pay such sums of money into the Treasury of the United States, in accordance with the procedure adopted by Henry L. Stimson, Secretary of War, acting through his delegate, Robert P. Patterson, in respect of excessive profits found by him to be due for the fiscal year of the plaintiff ending November 30, 1942, as heretofore, recited in this complaint, before The Tax Court of the United States of America shall have made or shall have had opportunity to make any determination of this plaintiff's petition for a redetermination of its excessive profits, if any, for its fiscal year ending 1943." See also note 42.

[15] The omission from the First Act of various provisions contained in the Second, see, e. g., note 9 supra, is alleged to afford basis for invalidating the former even though the latter may be held constitutional.

made, would be substantially a claim against the Government by way of setoff of the latter amount. Cf. *Mine Safety Co.* v. *Forrestal, supra.*

The Government has contested each of appellant's claims. But its primary contentions have been aimed at Aircraft's jurisdictional showing. It argues that the suit in substance and legal effect is one against the United States, to which there has been no governmental consent, cf. *Mine Safety Co.* v. *Forrestal, supra;* that the suit is premature, because the Tax Court proceedings have not been completed and until this has been done Aircraft will not have exhausted its administrative remedy, cf. *Macauley* v. *Waterman S. S. Corp., supra;* that the Tax Court has been given exclusive jurisdiction in renegotiation matters; and that, in any event, there is no jurisdiction of an equitable character in the District Court, to afford the relief appellant seeks, since it has an adequate remedy at law by suit upon its contracts to recover any amounts due from its customers, in which all questions of constitutionality may be determined. Cf. *Coffman* v. *Breeze Corporations, supra.*

In the latter connection appellee Hirsch, as chairman of the Board, has filed an affidavit admitting that he and the other appellees, unless restrained, will take steps, as appellant alleges, to prevent payment of the $270,000 by its customers to it, and also to secure payment of that sum into the Treasury. The affidavit sets forth, however, that direction for payment will not be required or made as to more than two or three of appellant's customers and, in the event this does not result in payment of the full amount, the Government will proceed to collect whatever may remain by suit against appellant.

Aircraft, on the other hand, both in the amended complaint and by the supporting affidavit of its president, alleged that no such sum as $270,000 was owing to it from, or could be collected by direction to, any two or three of

its customers. Rather it was set forth that collection of any such amount could be made only by direction to some sixteen or more customers. And on the same basis it is asserted that Aircraft's remedy by suit against its customers would require institution of numerous actions in different jurisdictions, resulting in expense and delay, as well as loss of good will and incurring the continued risk of the customers' solvency.[16]  Accordingly Aircraft claims that jurisdiction in equity is conferred upon the District · Court both by reason of the multiplicity of suits involved in asserting the legal remedy by actions against its customers and because of the injurious consequences which would follow from pursuing that course.

## II.

We do not find it necessary to undertake determining the threshold question whether the suit is one against the United States. Were the issue squarely presented as a formal claim for refund or setoff concerning the $204,000 collected by the Government for 1942, the case in that aspect would be very close to *Mine Safety Co.* v. *Forrestal, supra.*[17]

We do not tarry, however, to consider further this feature of the case, since the absence of formal and specific claim in the nature of setoff or otherwise indicates, we

---

[16] See note 42 *infra.*

[17] Although asserted by way of equitable setoff, the effect of allowing such a claim would be, as we said in the *Mine Safety* case, to prevent the Secretary from taking certain action which, though it would not "stop payment by the government of money lawfully in the United States Treasury to satisfy the government's and not the Secretary's debt to the appellant," nevertheless would amount to "an indirect effort to collect a debt allegedly owed by the government in a proceeding to which the government has not consented," 326 U. S. 374, 375, and to which, as in that case, it has not been made formally a party.

think, a strategic decision to avoid the difficulties which would follow upon its definite and unequivocal assertion, on the score of the nature of the suit as being one in fact and function against the Government. Something more than a mere suggestion of claim for relief is required to bring into play judicial power of affording remedy, especially when it appears there may be good reason deliberately accepted for going no farther. This is reinforced when the suggestion, if acted on, would involve the Court in decision of serious constitutional questions. They are not to be entertained upon dubious presentations or, most certainly, when the presentation reasonably may be taken as not intended to put them forward squarely and inescapably. Cf. *Rescue Army* v. *Municipal Court,* 331 U. S. 549; *Alma Motor Co.* v. *Timken-Detroit Axle Co.,* 329 U. S. 129. Accordingly we put to one side the lengthy allegations concerning the 1942 determination, and confine our consideration to the issues relating to the redetermination made for the fiscal year of 1943.

These also, the Government urges, substantially are effective to make the suit one against the Government, to which it has not consented. And for this view, likewise, it relies upon the *Mine Safety* decision, as well as others.[18] Appellant undertakes to distinguish the cases upon the basis that in the *Mine Safety* case the official action sought to be enjoined was conduct effective to stop the payment of funds out of the Treasury, whereas here the analogous conduct affects no funds in the Government's actual possession but seeks only to touch moneys held by third persons for appellant's or the Government's account. The difference, it is urged, is between action affecting only the withholding of government moneys and action effective to bring about collection from third persons of moneys claimed to be due to the Government.

---

[18] Especially *Louisiana* v. *McAdoo,* 234 U. S. 627; *Belknap* v. *Schild,* 161 U. S. 10; *In re Ayers,* 123 U. S. 443.

That difference indeed may be substantial. But we do not decide whether it is sufficient to enable the appellant to avoid the difficulty presented of foreclosing the Government's claim by a suit brought only against its officials, essentially as trespassers,[19] without joining the Government itself. In other words, we do not determine whether the suit is, in legal effect, one against the Government, since in our opinion the other grounds going to the District Court's jurisdiction are adequate to sustain its dismissal of the cause.

Ordinarily of course issues relating to exhaustion of administrative remedies, as a condition precedent to securing judicial relief, and to the existence of jurisdiction in equity are either separate or separable matters, to be treated as entirely or substantially distinct. The one generally speaking is simply a condition to be performed prior to invoking an exercise of jurisdiction by the courts. The other goes to the existence of judicial power in the basic jurisdictional sense. In this case, however, the exhaustion problem and that of equity jurisdiction are closely, indeed inseparably, related. And both are colored by the relevant specific provisions of the Renegotiation Acts, more particularly the Second, since it alone provides for Tax Court redetermination.[20]

---

[19] Appellant's claim is that ordering its customers not only to withhold funds due to it under the contracts but also to pay them into the Treasury would be, in effect, a "trespass upon its property" within the rule of *United States* v. *Lee,* 106 U. S. 196; cf. *Land* v. *Dollar,* 330 U. S. 731, and that execution of such orders would deprive it of vested property rights, contrary to various constitutional provisions. Since a decision of the constitutional issues would determine the Government's right to the funds, in any event, the case, like *Land* v. *Dollar, supra,* would seem to be one "where the question of jurisdiction [as involving the Government's immunity to suit] is dependent on decision of the merits." 330 U. S. at 735.

[20] The provision, however, applies to determinations made prior to the Act's effective date. See note 9 *supra.*

In *Macauley* v. *Waterman S. S. Corp., supra*, we were called upon to consider the relation between the Tax Court proceedings; as provided by § 403 (e) (1), and judicial proceedings instituted in the district or other courts of the United States in regard to renegotiation matters. Section 403 (e) (1) authorizes "any contractor or subcontractor aggrieved by an order of the Board determining the amount of excessive profits received or accrued by" him, to file a petition for redetermination with the Tax Court within ninety days after notice of the order is mailed.[21]   The section then provides:

> "Upon such filing such court shall have exclusive jurisdiction, by order, to finally determine the amount, if any, of such excessive profits received or accrued by the contractor or subcontractor, and such determination shall not be reviewed or redetermined by any court or agency."

The section expressly states that the proceeding "shall not be treated as a proceeding to review the determination of the Board,[22] but shall be treated as a proceeding de novo."   And the Tax Court is given the same powers and duties, "insofar as applicable," respecting "the contractor, the subcontractor, the Board and the Secretary, and in respect of the attendance of witnesses and the production of papers," together with other procedural matters, as the court has under specified sections of the

---

[21] Otherwise the Board's order becomes final.   § 403 (c) (1).   The provision reads: "In the absence of the filing of a petition with The Tax Court of the United States under the provisions of and within the time limit prescribed in subsection (e) (1), such order shall be final and conclusive and shall not be subject to review or redetermination by any court or other agency."

Similarly, a limitation of one year is placed upon "all liabilities of the contractor or subcontractor for excessive profits received or accrued" during each fiscal year.   See § 403 (c) (3).

[22] See note 11 *supra*.

Internal Revenue Code in redetermining a deficiency in taxes. Moreover, § 403 (e) (1) commands: "The filing of a petition under this subsection shall not operate to stay the execution of the order of the Board under subsection (c) (2)."

In the *Waterman* case, taking account of these provisions, we said: "The legislative history of the Renegotiation Act, moreover, shows that Congress intended the Tax Court to have exclusive jurisdiction to decide questions of fact and law,[23] which latter include the issue raised here of whether the contracts in question are subject to the Act." 327 U. S. at 544. "To grant the injunction sought," the opinion continued, "the District Court would have to decide this issue in the first instance. Whether it ever can do so or not, it cannot now decide questions of coverage when the administrative agencies [24] authorized to do so have not yet made their determination. Here just as in the *Myers* case, the administrative process, far from being exhausted, had hardly begun. The District Court consequently was correct in holding that it lacked jurisdiction to act." *Ibid.,* 544–545.

The *Waterman* case differed from this one in three respects. There the appellant had "hardly begun" the administrative process, while here Aircraft has done all that it can do. The Waterman Corporation had contracted directly with a government agency, the Maritime Commission. Here the appellant is a subcontractor, a difference of some importance in the matter of jurisdiction in equity later to be noted. The *Waterman* case, as we

---

[23] Citing, at 90 Cong. Rec. 1355, the statement of a sponsor in the House that the Tax Court could decide "all questions of fact and law . . . ." See also notes 30, 35 *infra.*

[24] The Waterman S. S. Corporation not only had failed to file a petition with the Tax Court but also had refused to attend renegotiation conferences with the Board or to supply information sought by it.

have said, raised only questions of coverage, not issues of constitutionality. Here both types of question are presented. On the other hand, the cases are substantially identical in the nature of the relief sought. Each complaint asked for a declaratory judgment upon the legal issues and for injunctive relief restraining further action looking toward application of the Act's provisions.

We do not think the differences mentioned are sufficient to distinguish the cases for purposes of applying the exhaustion rule. Certainly no such effect can be derived from the fact that in the *Waterman* case the plaintiff had not begun the administrative process, while here Aircraft has gone as far as it can. The doctrine, wherever applicable, does not require merely the initiation of prescribed administrative procedures. It is one of exhausting them, that is, of pursuing them to their appropriate conclusion and, correlatively, of awaiting their final outcome before seeking judicial intervention.

The very purpose of providing either an exclusive or an initial and preliminary administrative determination is to secure the administrative judgment either, in the one case, in substitution for judicial decision or, in the other, as foundation for or perchance to make unnecessary later judicial proceedings. Where Congress has clearly commanded that administrative judgment be taken initially or exclusively, the courts have no lawful function to anticipate the administrative decision with their own, whether or not when it has been rendered they may intervene either in presumed accordance with Congress' will or because, for constitutional reasons, its will to exclude them has been exerted in an invalid manner. To do this not only would contravene the will of Congress as a matter of restricting or deferring judicial action. It would nullify the congressional objects in providing the administrative determination. In this case these include securing uniform-

ity of administrative policy and disposition,[25] expertness of judgment, and finality in determination, at least of those things which Congress intended to and could commit to such agencies for final decision.

There can be no doubt whatever, in view of the legislative history, that Congress had each of these ends in view when it provided for the Tax Court proceedings, as well as for action by the Board prior to that stage. .Indeed the Board was created in large part to bring under a single aegis the last stage of informal renegotiation before the Tax Court action, in order thus to secure as nearly as possible uniform policy and administration of renegotiation problems.[26] This policy was followed and reinforced in the provision for Tax Court redetermination. And that procedure was chosen deliberately in preference to judicial review in the Court of Claims or elsewhere, primarily because of the Tax Court's [27] expertness in fiscal matters analogous to those arising in connection with renegotia-

[25] See note 26 *infra.*

[26] See 89 Cong. Rec. 9928–9929. Previously the governmental departments concerned with renegotiation had set up a central board to effect a "more uniform policy in the determination of excessive profits," H. Rep. 871, 78th Cong., 1st Sess., 75, but there was dissatisfaction with the board thus voluntarily established, see 89 Cong. Rec. 9934, and "insistence in Congress that coordination between the departments having renegotiating authority under the prior act be not a matter of voluntary cooperation but one of statutory necessity." Steadman, A Further Legal Inquiry Into Renegotiation: I (1944) 43 Mich. L. Rev. 1, 6.

[27] See 53 Stat. 158, as amended by 56 Stat. 957, 26 U. S. C. (Supp. V, 1946) § 1100: "The Board of Tax Appeals (hereinafter referred to as the 'Board') shall be continued as an independent agency in the Executive Branch of the Government. The Board shall be known as The Tax Court of the United States and the members thereof shall be known as the presiding judge and the judges of The Tax Court of the United States."

tion problems,[28] as well as its essentially judicial procedures and experience.[29]

It is equally clear that Congress intended to endow the Tax Court's decisions with a very large degree of finality, as appears from the very terms of § 403 (e) (1), from the whole structure of the Act, and from the legislative history.[30] The express command of § 403 (e) (1) is not simply that the Tax Court shall have "exclusive jurisdiction, by order, to finally determine" the amount of excessive profits, if any. It is also that the determination "shall not be reviewed or redetermined by any court or agency." This is buttressed by the prohibition that filing the petition shall not operate to stay execution of the Board's order under § 403 (c) (2).[31] And not irrelevant to the statute's general policy of finality are the provisions making the Board's determinations final, if the petition for Tax Court redetermination is not filed in the specified time, and those of the Secretary or his delegates final if similar action is not taken to secure redetermination by the Board. § 403 (c) (1).

---

[28] See H. Rep. 871, 78th Cong., 1st Sess., 77; Steadman, A Further Legal Inquiry Into Renegotiation: II (1944) 43 Mich. L. Rev. 235, 270; cf. S. Rep. 627, 78th Cong., 1st Sess., 109; H. Rep. 1079, 78th Cong., 2d Sess., 83.

[29] *Dobson* v. *Commissioner*, 320 U. S. 489, 498; cf. note 27.

[30] "That court will have exclusive jurisdiction, by an order, to make a final determination as to whether excessive profits have been received or accrued, or whether a fair price has been determined, and The Tax Court's determination may not be reviewed or redetermined by any other court or agency." H. Rep. 871, 78th Cong., 1st Sess., 77. See also 89 Cong. Rec. 9930: "The committee has provided that any contractor aggrieved by a determination of excessive profits under the old law, whether he was cooperative and signed a closing agreement or not, may have a review of that determination in the Tax Court of the United States and in the review have all issues, constitutional and otherwise, decided by the court."

[31] See note 13 *supra*.

True, the statute expressly confers rights to follow through the various stages of the procedure to the end of the Tax Court phase. Nevertheless its entire structure indicates the congressional purpose to have matters of renegotiation promptly and expeditiously settled; and to accomplish this as far as possible both by informal negotiations and by introducing the compulsion of finality at every stage unless each succeeding one is taken as commanded.

At the height of the war Congress recognized, as did the procuring agencies,[32] that speed in procurement, and consequently in production of war materials, outweighed all other considerations normally applicable. And while renegotiation was a product of that necessity rather than a cause, the problems it raised were time consuming and closely related to pricing difficulties.[33] Often they worked to hinder and delay the process of procurement. Congress therefore sought, so far as possible, to relieve the interrelated processes from the tedious burden of litigation. It did this by writing the policy of finality into the Act's provisions at each successive procedural stage, although

---

[32] The record contains an affidavit made by Robert P. Patterson when Under Secretary of War which reads in part: "Wartime procurement for the military establishment differs radically from procurement in times of peace. Speed in production at once becomes all-important. . . ."

". . . the war procuring agencies cannot use normal methods of procurement. The pressing need for speed requires the abandonment of drawn-out negotiation and the careful surveys of all relevant factors which sound purchasing would otherwise require. Competition necessarily wanes and no longer offers an adequate guide to the prices which should be paid. Above all, the forecasting of costs of production becomes, in large measure, a matter of informed guessing rather than of real cost analysis."

[33] The Second Renegotiation Act separated the repricing authority from renegotiation. See 58 Stat. 92, 50 U. S. C. App. (Supp. V, 1946) § 1192. See also S. Rep. 627, 78th Cong., 1st Sess., 37–38.

saving the right of resort eventually to the Tax Court to those acting promptly in the prescribed way.

We do not express any opinion, indeed we explicitly reserve decision, upon the question of the finality of Tax Court decisions in these matters. But we cannot infer from a statute so conditioned in background, purpose, terms and compulsion derived from the inevitable circumstances of its application that Congress intended to allow skirting the procedures devised altogether or partially, more particularly in any case where following them could result in no greater loss than the delay and inconvenience which would flow from inability to seek some other remedy not dependent upon their completion.

We are not forced in this case, however, to decide whether Congress intended to give the Tax Court the last word upon all questions of fact and law, or whether it could do so if that were surely its purpose. Nor need we become involved in an attempt to decide what particular questions it might have left, or did leave, for that body's final and conclusive disposition. For it seems obvious, in view of the Act's terms, history, objects and the policies incorporated, that Congress clearly and at the very least intended the Tax Court's functions not only to be put in motion but to be fully performed, before judicial intervention should take place at the instance of one in appellant's position.

This indeed was the ruling of the *Waterman* case. And we do not think the effect of that ruling is exhausted simply because constitutional questions were not raised there, but have been put forward in this cause. Nor is it overcome, in our judgment, by the showing which has been made on this record of irreparable injury and of the need as well as the power of equity to forestall the complete operation of the congressionally prescribed procedure.

On the contrary, whatever may be true of other situations,[34] in this case the very fact that constitutional issues are put forward constitutes a strong reason for not allowing this suit either to anticipate or to take the place of the Tax Court's final performance of its function. When that has been done, it is possible that nothing will be left of appellant's claim, asserted both in that proceeding and in this cause, concerning which it will have basis for complaint.

The Tax Court may decide entirely in appellant's favor. Indeed, if it can sustain there the claims and issues it offers to support here, that possibility is not an unlikely one. For, apart from the questions of constitutionality and of the Tax Court's power to decide them finally or otherwise,[35] appellant has put forward, in both proceedings,[36] claims of exemption and noncoverage relating to contracts involving much larger amounts than the aggregate sums affected by renegotiation, after deduction of tax credits.[37] And if those claims are well founded, as to which of course we express no opinion, the Tax Court's determination

[34] See note 38 *infra*.

[35] See notes 23, 30 *supra;* cf. *Helvering* v. *Independent Life Ins. Co.*, 292 U. S. 371, reversing 67 F. 2d 470, affirming 17 B. T. A. 757; *Stein Bros. Mfg. Co.* v. *Secretary of War*, 7 T. C. 863.

[36] A copy of the petition for redetermination filed in the Tax Court by appellant has been attached as an exhibit to the complaint.

[37] Appellant in its complaint alleged, for example, that although for the fiscal year ending November 30, 1943, its total sales amounting to $3,548,845.50 were renegotiated, "only $2,207,574.95, in any event, were subject to renegotiation; that $1,312,250.07 of its total sales were of 'Standard Commercial Articles' as defined in the Renegotiation Act; were articles sold under competitive conditions affecting the sale thereof in a manner which reasonably protected the Government against excessive prices, and, as such, were not subject to renegotiation; that $29,020.48 of its total sales were not sold for the ultimate use of the United States of America or any department, agency or instrumentality thereof, but were made and sold for civilian use, and, as such, were not subject to renegotiation."

of these matters of coverage, which we held in the *Waterman* case are initially at least for its disposition, well might render consideration of the constitutional questions by it unnecessary and this cause moot.

Certainly that possible outcome should not be anticipated, either here or by the District Court, through a decision in this case on the constitutional issues. *Rescue Army* v. *Municipal Court,* 331 U. S. 549. No more should it be forestalled by decision upon the matters of coverage. *Macauley* v. *Waterman S. S. Corp., supra.*

It is true that the presence of constitutional questions, coupled with a sufficient showing of inadequacy of prescribed administrative relief and of threatened or impending irreparable injury flowing from delay incident to following the prescribed procedure, has been held sufficient to dispense with exhausting the administrative process before instituting judicial intervention.[38] But, without going into a detailed analysis of the decisions, this rule is not one of mere convenience or ready application. Where the intent of Congress is clear to require administrative determination, either to the exclusion of judicial action or in advance of it, a strong showing is required, both of inade-

---

[38] Thus, the Court has permitted resort to a federal court of equity where a state was enforcing confiscatory rates and by its law precluded a stay or supersedeas until the state courts "acting in a legislative capacity" had taken final action. *Oklahoma Natural Gas Co.* v. *Russell,* 261 U. S. 290; *Pacific Tel. & Tel. Co.* v. *Kuykendall,* 265 U. S. 196; *Porter* v. *Investors Syndicate,* 286 U. S. 461. For other decisions holding that a federal court may exercise its equitable jurisdiction where there is an inadequate state remedy to correct a constitutional wrong, see *Hillsborough* v. *Cromwell,* 326 U. S. 620; *Wallace* v. *Hines,* 253 U. S. 66.

The rule has been applied most frequently in respect to state rather than federal administrative action, though of course it is not inapplicable to the latter, notwithstanding the power of Congress to regulate the jurisdiction and procedure of the federal courts may present obstacles to its application not present in state cases.

quacy of the prescribed procedure and of impending harm, to permit short-circuiting the administrative process. Congress' commands for judicial restraint in this respect are not lightly to be disregarded.

More especially is this true with legislation, of this type, adopted during and to meet the emergency of war and resting, at least in part, upon war powers. For, in such cases, "only if we could say in advance of resort to the statutory procedure that it is incapable of affording due process to petitioners could we conclude that they have shown any legal excuse for their failure to resort to it or that their constitutional rights have been or will be infringed," *Yakus* v. *United States*, 321 U. S. 414, 435, a statement implicitly requiring exhaustion, not merely initiation, of the statutory procedure.

We need not decide in this case, however, whether mere doubt concerning the adequacy of administrative or other relief would be sufficient for allowing anticipation of the administrative determination. For that course is not to be followed if there is another remedy, not inconsistent with the congressional command, and of certain character, even though it be neither so expeditious or convenient as some other sought to be substituted which circumvents that command. To this of course should be added the further qualification that following the prescribed remedy, upon the showing made, will not certainly or probably result in the loss or destruction of substantive rights.

This brings us to consideration of the showing made here in support of equity's intervention. That showing, we think when considered in the light of the foregoing principles and of the statute's clear purpose and intent, is not sufficient.

Whatever may be the scope allowed generally for equity to intervene upon the ground of inadequacy of legal remedies, where no explicit congressional command exists for following a prescribed procedure, the problem when

such a mandate is present is entirely different from one tendered in its absence. The very fact that Congress has made the direction must be cast into the scales as against the factors which, without that fact, would or might be of sufficient weight to turn the balance in favor of allowing utilization of equity's resources. That fact itself may be of such weight as to turn the scales the other way, even in situations much more doubtful than the present one. In short, the so-called general principles governing the exercise of jurisdiction in equity are not to be taken, in such a case, as isolated from all effect of the legislative mandate or necessarily or even readily as overriding it.

In the first place, there can be no doubt of the availability or indeed of the certainty and effectiveness of appellant's remedy at law by suit upon its contracts against its customers claimed to owe it money under those agreements. Suits of that character are not forbidden, either expressly or impliedly by the Renegotiation Acts. Nor are they made dependent upon completion of the Tax Court proceedings.[39] Moreover we know of no reason

---

[39] It is unnecessary to consider whether in such a suit a district court should find it proper to defer its final decision until after the Tax Court had made its final redetermination, in order possibly to avoid the necessity of deciding the constitutional questions. Cf. *American Federation of Labor* v. *Watson,* 327 U. S. 582, 599, and cases cited. For, even in the event of such action, the court would have power to preserve, pending the administrative decision, the *status quo* and all rights of the appellant. The provision in § 403 (e) (1) that the filing of a petition with the Tax Court "shall not operate to stay the execution of the order of the [War Contracts Price Adjustment] Board" under § 403 (c) (2) does not mean that the courts are deprived of their power to grant stays where necessary. "Where Congress wished to deprive the courts of this historic power, it knew how to use apt words . . . ." *Scripps-Howard Radio* v. *Federal Communications Commission,* 316 U. S. 4, 17. It did so in the Emergency Price Control Act of 1942, 56 Stat. 23; see *Yakus* v. *United States,* 321 U. S. 414, 429, 437, using very explicit language. Here the provision literally at any rate appears to mean only that there shall be no automatic stay by virtue of filing the petition in the Tax Court.

why every question of constitutionality which has been raised in this suit could not be presented and determined in such a suit.

In addition, there is special reason in the statutory provisions why that course should be followed rather than allowing the present suit. Appellant is, as we have pointed out, a subcontractor, not a contractor with the Government. While its suit could be instituted directly only against the contractor with whom it had dealt, nevertheless it is hardly conceivable that the Government would permit the suit to go to final judgment without intervention by it or, at the least, undertaking the responsibility for making the defense. For by § 403 (c) (2)[40] it is expressly provided: "Each contractor and subcontractor is hereby indemnified by the United States against all claims by any subcontractor on account of amounts withheld from such subcontractor pursuant to this paragraph."

In the face of this indemnity, the contractor becomes substantially a stakeholder as between the Government and the subcontractor, and the latter's suit against the contractor, if terminated favorably to the complainant, would obligate the Government to indemnify or reimburse the contractor for the liability thus incurred. In effect, the Government has consented to suit by the contractor in the Court of Claims on account of any liability the contractor incurs by virtue of lawful payment of the subcontractor's claims.

Accordingly, there would seem to be no substantial reason for regarding the suit against the contractor as inherently inadequate or ineffective for the protection of any rights of the appellant, including constitutional ones.

---

[40] The paragraph covers withholding payment pursuant to direction by the Board to the contractor, for the account of the United States. See note 13 *supra*.

In this respect the case stands identically with *Coffman* v. *Breeze Corporations, supra.*[41]   If any such inadequacy exists, it must be by virtue of factors extraneous to the nature of the suit itself and not present in the *Coffman* case.

These appellant seeks to establish in its showing relating to multiplicity of suits and irreparable injury.   Apart from multiplicity, the showing concerning injury certainly would not be sufficient to justify eliminating the Tax Court proceeding.[42]   Boiled down, the allegations come

[41] The situation of the licensor in the *Coffman* case, with reference to the remedy by suit against its licensees was exactly the same as appellant's situation here in respect to suit against its customers, the contractors with the Government.   We said, as to the adequacy of that remedy: "But whether the provisions of the Act be valid or invalid appellant shows no ground for equitable relief.   If valid they would be a defense, and appellant would be entitled to no relief other than that afforded by the suit against the Government authorized by § 2 of the Act.   If invalid, appellant's right to recover remains unimpaired.   The sufficiency of the defense may be as readily tested in a suit at law to recover the royalties as by the present suit in equity to enjoin payment of the royalties into the Treasury.   In either case appellant would receive all the relief to which it shows itself entitled."   323 U. S. at 323.

The *Coffman* decision stood squarely upon the grounding of the adequacy of the remedy by suit against the licensees, although it rested also upon the alternative ruling that there was no case or controversy.   This was for the reason that the appellant asserted no right to recover the royalties, but asked only a determination that the Royalty Adjustment Act was unconstitutional "and, if so found, that compliance with the Act be enjoined, an issue which appellee . . . declines to contest."   This, we said, made the prayer of the bill "but a request for an advisory opinion as to the validity of a defense to a suit for recovery of the royalties."   323 U. S. at 323, 324.

[42] It is alleged that appellant, unless allowed to maintain this suit, will be caused unnecessarily to run the risk of impaired credit or insolvency of customers directed to withhold funds; that its working capital essential to carrying out its obligations with contractors and subcontractors would be reduced; that its operations "will be ham-

to appellant's assuming, for the period necessary to secure either the Tax Court's decision or final judgment in suits against its customers directed to withhold, the continued risk of their solvency, without specific allegation that any of them is seriously so threatened or facts to support such a claim; and to deprivation, for the same period, of the use of $270,000 directed to be withheld.[43]   We do not think this showing alone, without regard to multiplicity, approaches what would be required to sustain the intervention of a court of equity, particularly in order to avoid or anticipate the congressionally authorized proceeding.

Nor, in the facts of this case, is the showing made concerning multiplicity of suits sufficient for that purpose. Appellant's case as made in this feature is that it would be forced to sue some sixteen "or more" customers, in various and scattered jurisdictions, with consequent expense of litigation and "resultant ill-feeling and irreparable injury" to good will and appellant's business.   On

---

pered and its business irreparably damaged by the reduction of its working capital"; and that it will be forced either to continue supplying customers directed to withhold payment, impairing its assets and the interests of stockholders or, in the alternative, to refuse making such shipments with the asserted consequence of being unable to continue in business, "inasmuch as a substantial portion of its market for its products presently is prime contractors with the United States and subcontractors thereof."

[43] Appellant also alleges that it "could not recover interest for the use of its money" in a suit against the United States in the Court of Claims, which on other counts it asserts is both unavailable and inadequate.   There is no allegation, however, concerning interest as not being recoverable in suits against its customers.   And, as we have pointed out above, the statutory indemnity provided for such contractors is in sufficiently broad terms to cover interest as well as any other liability incurred by them through authorized withholding, a guaranty which certainly would not preclude recovery of interest by the suit against the contractors if terminated on the merits in appellant's favor.

the other hand stands the affidavit of appellee Hirsch that direction for withholding and payment into the Treasury will not be needed or given in more than two or three instances, and in case any balance should remain it will be collected through suit instituted by the Government.

Whether the District Court accepted one version of the facts or the other, it found there was no sufficient basis in the claim of multiplicity to sustain equity's assumption of jurisdiction. We would not be disposed to override that judgment of the trial court, turning as much as it may upon questions of fact.[44]

Moreover, it is not apparent, at any rate from the allegations, why it would be necessary for appellant to sue all of the sixteen customers or indeed perhaps more than one of them in order to secure a determination of its constitutional rights or preserve its rights. A single test suit would serve the former purpose fully, and there are no allegations of fact sufficient to show that appellant's rights of recourse against others probably would be lost by awaiting the outcome of such a suit, either legally through the operation of statutes of limitations or practically, as we have said, through any probable incidence of insolvency.

In the absence of either kind of showing, the injury appellant seeks to avoid by the argument of multiplicity actually comes down, as we have said, to deprivation of the use of the amount withheld for the period required for

---

[44] It is perhaps of some significance in this respect that the complaint contains allegations, though not made in this connection, relating to both the fiscal years 1942 and 1943 to the effect that over 80 per cent of the dollar value of appellant's total shipments were made to three private concerns, Fairchild Engine and Airplane Corporation, General Motors Corporation, Woodward Governor Company, and the United States Navy. Concerning the shipments to the Navy, see note 8.

completion of the Tax Court proceedings or a test suit against a customer. Whether or not there will be any injury in this limited respect depends of course, first, on the outcome of the Tax Court proceedings, particularly in relation to the matters of coverage; second, on whether, upon the assumption that those proceedings sustain the Government's claim as to all or part of the $270,000, the amount thus found due is finally held, in authorized litigation, to be due and owing to the appellant or to the Government. And, as we have also said, if that result should favor the appellant, the Government's obligation to indemnify the contractor would be, in effect, indirectly available to appellant to indemnify it for any loss of the use of the moneys withheld.[45]

Whatever might be true in other circumstances, this showing as to the necessity for suing many customers is hardly sufficient to justify the substitution of equity's extraordinary relief for what in all the conditions of this case appears to be a full, adequate and completely available remedy at law. *Coffman* v. *Breeze Corporations, supra; Macauley* v. *Waterman S. S. Corp., supra.*

Indeed the argument of multiplicity, with others, was expressly advanced and rejected in the *Waterman* case, as ground for not applying the *Myers* rule and for sustaining declaratory and equitable intervention to circumvent it. After noting the company's claim, with others, that "it would be subjected to a multiplicity of suits in order to recover the money due on the contracts," we there said: "Even if one or all of these things might possibly occur in the future, that possibility does not affect the application of the rule requiring exhaustion of administrative remedies. The District Court had no power to determine in this proceeding and at this time issues that might arise

---

[45] See note 43 *supra.*

because of these future contingencies." 327 U. S. at 545.

This case is perhaps even stronger than the *Waterman* case for application of the *Myers* rule. For here the appellant is a subcontractor retaining what the contractor complainant did not have in the *Waterman* case, namely, a completely adequate remedy at law against its customers, buttressed by the Government's guaranty of indemnity to the contractor for all liability incurred by him on account of withholding funds allegedly due the appellant.

In view of that fact the further one that constitutional issues are included among those tendered in this case but were not presented in the *Waterman* case, becomes wholly immaterial. To countenance short-circuiting of the Tax Court proceedings here would be, under all the circumstances but more especially in view of Congress' policy and command with respect to those proceedings, a long overreaching of equity's strong arm.

The judgment is

*Affirmed.*

MR. JUSTICE JACKSON concurs in the result.

MR. JUSTICE DOUGLAS dissents.