**W. A. LUCAS and A. S. Lucas, trading and doing business as Lucas Coal Company, et al., Plaintiffs,**

v.

**Rogers C. B. MORTON, Secretary of the Interior, et al., Defendants.**

Civ. A. No. 71–1117.

United States District Court, W. D. Pennsylvania.

May 15, 1973.

Henry J. Wallace, Jr., Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiffs.

Peter J. P. Brickfield, U. S. Dept. of Justice, Civil Div., Washington, D.C., and James Villanova, Asst. U. S. Atty., Pittsburgh, Pa., for defendants.

Before ALDISERT and WEIS, Circuit Judges and SORG, District Judge.

## OPINION

WEIS, Circuit Judge.[*]

The plaintiffs are operators of surface coal mines (strip mines) located in Western Pennsylvania at whose behest this Three-Judge Court has been convened to consider challenges to the constitutionality of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S. C.A. § 801 et seq. Certain features of the Act and its administration have come under attack by the plaintiffs who allege that:

1. The statute is discriminatory because its provisions include those applicable to deep coal mines as well as strip mines;

2. The statutory plan of enforcement denies due process;

3. Inadequate training of inspectors who administer the Act has resulted in harassment and unnecessary loss to the plaintiffs.

The named plaintiffs are all independent owners and operators of strip mines located in Butler and Mercer Counties, Pennsylvania, constituting about 40 percent of small mine operators in these areas. During 1971 they produced a to-

---

[*] At time this suit was filed and at argument, Judge Weis was a United States District Judge for the Western District of Pennsylvania.

tal of approximately 900,000 tons of coal.

Between October 6, 1971 and October 12, 1971, plaintiffs were served with notices of violations pursuant to Section 104(b) of the Act. These notices, which are quite similar to the usual form of citation, were based upon alleged violations of Mandatory Safety Standards for Surface Coal Mines and Surface Work Areas of Underground Coal Mines enacted by the Secretary of the Interior pursuant to authority granted by the Act. The specific notices, which plaintiffs have chosen to contest here, deal with failures to have adequate roll· protection and audible backup warning devices on vehicles utilized in strip mine operations.

Pursuant to Section 105[1] of the Act, the plaintiffs filed applications for review of the notices and hearings were held before authorized agency personnel on June 20 and June 22, 1972. No decisions have yet been rendered in those cases. At the time the citations or notices· were issued, departmental representatives set initial periods of not exceeding 30 days within which the violations were to be abated.

Hearings have not been scheduled on all of the notices as yet and no "orders of withdrawal", which is the sanction for failure to abate the violation, have been issued pursuant to agreement between the parties pending the decision in this case.

In October of 1971 Lucas Coal Company was also served with an order of withdrawal pursuant to Section 104(a)[2] of the Act, which requires such action when an imminent danger exists. This order was later vacated after an appeal through the administrative procedures of the Department of the Interior. The plaintiffs are not now concerned with this particular incident and do not contend that Section 104(a) is unconstitutional since it may be invoked only when danger is said to be imminent.

The Federal Coal Mine Health and Safety Act of 1969, which became effective on March 30, 1970, was designed to promulgate and provide enforcement of mandatory health and safety standards aimed at reductions in the number of coal mine accidents and incidents of occupational disease.

Title I of the Act establishes the procedure for preparation of health and safety standards and their publication. On May 22; 1971 pursuant to this direction there were disseminated in the Federal Registry (36 F.R. 9364–Part 3), Part 77—Mandatory Safety Standards, Surface Coal Mines and Work Areas of Underground Coal Mines. Revisions were published on July 15, 1971 in 36 F.R. 13142.

The main thrust of plaintiffs' attack centers on the provisions for enforcement set out in Section 104(b) which plaintiffs claim permit the inspectors to shut down the mine by means of a withdrawal order before the operator has an opportunity to have a hearing on notice of an alleged violation. Plaintiffs assert that a withdrawal order in effect deprives them of the opportunity to mine coal, to use their property, and thus results in severe financial loss. They contend that elementary due process requires that they be given the opportunity to be heard before a penalty is inflicted upon them.

Section 104(b)[3] provides in effect that if a mine inspector finds that there is a violation of a mandatory safety

---

1. 30 U.S.C. § 815.

2. 30 U.S.C. § 814(a).

3. "Except as provided in subsection (i) of this section, if, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard but the violation has not created an imminent danger, he shall issue a notice to the operator or his agent fixing a reasonable time for the abatement of the violation. If, upon the expiration of the period of time as originally fixed or subsequently extended, an authorized representative of the Secretary finds that the violation has not been totally abated, and if he also finds that the period

standard, which does not create an imminent danger, he may issue a notice to the operator fixing a reasonable period of time for the abatement. If at the end of that time the violation has not been corrected, the inspector issues an order to the operator requiring that all persons be withdrawn from the area where the mining is being carried on and which is affected by alleged infraction.

In the context of the factual background of one of the violations, for example, when the mine inspector found that a large power shovel did not have the rollover protection set out in the mandatory safety standards, he issued a notice requiring compliance within a certain time. Failure to add the required equipment would result in a shutting down of the mine. Plaintiffs desired to present defenses alleging that such accessories are not readily if available at all on the market, are not desirable or necessary in the open strip mine type operation, and purchase would result in unnecessary and heavy expense.

The administrative remedies available to the aggrieved operator are set out generally in Section 105(a)(1).[4] In essence the statute provides that an operator who has been issued such a notice may apply to the Secretary for review which permits an investigation by the Department and an opportunity for a public hearing. The Act, however, does not provide for a stay of the proceedings pending such public hearing, even though a petition for review is filed.

█ It is possible to read the Act, therefore, as requiring an operator to make a choice between abating the alleged violation even though a hearing has not yet been held or subjecting himself to the severe penalties set out in the Act if his application for review is unsuccessful. Were such procedures mandated by the Act, we would indeed face serious claims of deprival of due process.

The Department of Interior, in a decision by the Board of Mine Operations Appeals in the matter of Reliable Coal Corporation, Docket No. HOPE 71–50, has held that while Section 105 speaks only of the reasonableness of the time set out in the notice of violation as being a proper subject of review, this also includes the fact of violation itself. The Board reasoned that "any time for abatement is an unreasonable time if no violation exists," and that, "a decision

of time should not be further extended, he shall find the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to cause immediately all persons, except those referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that the violation has been abated." 30 U.S.C. § 814(b)

4. "An operator issued an order pursuant to the provisions of Section 104 [814] of this title, or any representative of miners in any mine affected by such order or by any modification or termination of such order, may apply to the Secretary for review of the order within thirty days of receipt thereof or within thirty days of its modification or termination. An operator issued a notice pursuant to section 104(b) or (i) [814(b) or (i)] of this title, or any representative of miners in any mine affected by such notice, may, if he believes that the period of time fixed in such notice for the abatement of the violation is unreasonable, apply to the Secretary for review of the notice within thirty days of the receipt thereof. The applicant shall send a copy of such application to the representative of miners in the affected mine, or the operator, as appropriate. Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing, at the request of the operator or the representative of miners in such mine, to enable the operator and the representative of miners in such mine to present information relating to the issuance and continuance of such order or the modification or termination thereof or to the time fixed in such notice. The filing of an application for review under this subsection shall not operate as a stay of any order or notice." 30 U.S.C. § 815(a)(1).

under 105(a) on the issue of reasonableness of time must inherently incorporate a determination if the violations did or did not occur." The Board went on to say, "In holding that an applicant's right of review under Section 105(a) of notices issued pursuant to Section 104(b) or (i) is limited to situations where the violation charged in the notice is unabated, we realize that any meaningful administrative review would have to take place within the time allowed by the Bureau for abatement. This is particularly significant since . Section 105(d) provides that no temporary relief shall be granted in case of a notice issued under Section 104(b) or (i) of the Act. In these cases, therefore, the Office of Hearings and Appeals is prepared, upon request, to provide an expedited hearing and speedy ruling, where need be, to forestall the issuance of an order of withdrawal if it is determined that no valid basis exists for issuance of such order. We go further and say that the Office of Hearings and Appeals stands ready to provide expeditious review in any case where irreparable injury may result and time is of the essence to any applicant seeking to exhaust his administrative remedy."

      \*    \*    \*    \*    \*    \*

" . . . If there is undue or unreasonable delay, in prosecution of such cases, we recognize that such delay may be prejudicial and do violence to basic due process requirements for prompt and expeditious resolution of such proceedings, in which event remedial orders of an Examiner or this Board may be appropriate."

It is apparent, therefore, that the Department of the Interior recognizes the requirements of due process which must be followed in the event of notices issued under Section 104(b). The Board of Appeals did point out that the statute itself, 105(d), says:

"No temporary relief shall be granted in the case of a notice issued under Section 104(b) or (i) of this title."

However, at oral argument the Government attorneys called our attention to Section 104(g) which does provide that "A notice or order issued pursuant to this section . . . may be modified or terminated by an authorized representative of the Secretary." Modification of an order, obviously, may consist of extending the time for abatement until after a hearing has been held and an opportunity extended to the operator to present his defenses.

Further discretion is granted to the Secretary under Section 105(d) which provides that he may grant temporary relief from an *order* if a hearing has been held and that there is a likelihood that the findings of the Secretary will be favorable to the applicant and that such relief will not adversely effect the safety of the miners.

Reduced to its simplest terms, the contention of the plaintiff, therefore, is that Sections 104(b) and 105(a) may be read and applied in such a fashion as to result in deprivation of their property before a hearing in situations where no imminent danger exists.

Our analysis of the statute, however, leads us to the conclusion that by giving a broad interpretation to Section 104(g), the Secretary is enabled to take such steps as would be necessary to allow the plaintiffs to present their contentions to the administrative tribunal before imposition of an order of withdrawal. We have no reason to expect that the Secretary will not utilize such an approach since the decision of the Board of Mine Operations Appeals in the Reliable Coal case recognizes the due process issue and offers expedited hearings to cope with the problem.

In a situation where alternative constructions of a statute are possible, due deference to the legislative branch of government and sound rules of statutory construction require us to choose that interpretation which will avoid a declaration of unconstitutionality. Since we find that such an interpretation is

possible in this case, we are unwilling to declare the statute unconstitutional on its face.[5]

Having once adopted this position, we come now to consider the specific incidents of which the plaintiffs complain and the applicability of the doctrine of exhaustion of administrative remedies.

■ We were advised by the Government at oral argument that administrative proceedings have already resulted in a modification of some of the mandatory standards which had been objectionable to the strip miners. This development and the vacation of the Lucas 104(a) withdrawal order through administrative action indicate that there is a possibility, if indeed not a probability, that the specific grievances of the plaintiffs in this case may be satisfactorily resolved by the departmental hearing method. Certainly the statute contemplates that the agency should have the opportunity to decide the disputes before there is recourse to the courts and decisional law supports such a policy. *See* McKart v. United States, 395 U.S. 185, 192, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969); Aircraft and Diesel Corp. v. Hirsch, 331 U.S. 752, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947). For an analogous fact situation which arose under the Occupational Safety and Health Act of 1970, *see* Lance Roofing Co. v. Hodgson, 343 F.Supp. 685 (N.D.Ga.1972), cert. den. 409 U.S. 1070, 93 S.Ct. 679, 34 L.Ed.2d 659.

Having found that the Act is not unconstitutional on its face, therefore, we will require the plaintiffs to exhaust their administrative remedies and will dismiss the Statutory Court phase of the litigation.

■ We think it appropriate to note that we do not preclude the plaintiffs from applying to a single judge court for the issuance of an injunction in a situation where the Secretary would be infringing upon constitutional requirements of due process in failing to properly utilize his discretion under Section 104(g). If the aggrieved party can demonstrate, in a particular factual context, that irreparable harm will be done by failing to have a hearing before a withdrawal order is issued and that no countervailing interests of safety are involved, then the power of the court may be invoked under the authority exemplified by Mills v. Richardson, 464 F.2d 995 (2d Cir. 1972).

■ The prohibition of injunctions set out in Section 513[6] of the Act refers to Titles II and III and, hence, would not be applicable, as we see it, to proceedings under Title I. We do not deem it necessary at this time to consider the effect of Section 106(c)(1)[7] in the event that a constitutional challenge to a specific action of the Secretary would be presented.

■ We do not dwell long upon the plaintiffs' other main contention, that is, that there is unconstitutional discrimination embodied in the statute by its application to both deep coal mines and surface or strip mines. While a review of the Act supports the plaintiffs' contention that strip mines were added as an afterthought by Congress and that the verbiage might have been, but was not, appropriately revised to take care of the situation, nonetheless we find the contention of no merit. The regulations promulgated by the Secretary do delineate to some extent equipment used in surface type work as opposed to that in the deep mine. It is true that there is some grouping in other sections of the regulations but this in and of itself is not unconstitutional.

There has been some understandable irritation by the plaintiffs and others in

---

5. "To give such meaning is not barred by intellectual honesty. So to interpret is in the candid service of avoiding a serious constitutional doubt." United States v. Rumely, 345 U.S. 41, 47, 73 S.Ct. 543, 546, 97 L.Ed. 770 (1952).

6. 30 U.S.C. § 960.

7. 30 U.S.C. § 816(c)(1).

the strip mining industry at the lack of appreciation by the Department and some of its new inspectors of the difference between surface mine conditions and those of the deep mines. We expect that modification of the pertinent regulations which is now in progress on a case-by-case basis, and experience gained by the inspectors will in time alleviate this problem.

 The issue of training of the inspectors which is mandated by the Act to be undertaken by the Secretary is not properly a matter for a Three-Judge Court and will be remanded to the single judge to whom this case will now be referred. We need express no opinion on that matter at this time.