The TOWNSHIP OF LOWER ALLO-
WAYS CREEK and Samuel E. Donelson,
Mayor, Harry Coleman, Earl Pancoast,
W. David Strong, and Robert A. Traae,
Committeemen, Plaintiffs,

v.

The UNITED STATES NUCLEAR REGU-
LATORY COMMISSION, and Joseph M.
Hendrie, Chairman of the United States
Nuclear Regulatory Commission and
The United States of America, Defend-
ants.

Civ. A. No. 79–1129.

United States District Court,
D. New Jersey.

Dec. 10, 1979.

**444**

Carl Valore, Jr., Valore, McAllister, Aron & Westmoreland, Northfield, N. J., for plaintiffs.

Robert J. Del Tufo, U. S. Atty. by Charles S. Crandall, Asst. U. S. Atty., Newark, N. J., for defendants and Irwin B. Rothschild, III, Leonard Bickwit, Jr., Stephen F. Eilperin, Nuclear Regulatory Commission, Washington, D. C., of counsel.

## OPINION

BROTMAN, District Judge.

This is an action brought by the Township of Lower Alloways Creek, in Salem County, New Jersey, and by the mayor and committeemen of that Township, seeking assorted forms of declaratory and injunctive relief related to the proposal of Public Service Electric and Gas Company ("Public Service") to expand the waste storage capacity of Units # 1 and # 2 of its Salem Nuclear Generating Station.[1] Jurisdiction of this court is asserted to arise under the due process and legislative powers clauses of the Constitution, U.S.Const. amend. V and art. I, § 1, respectively, the National Environmental Policy Act, 42 U.S.C. § 4321, et seq., the Atomic Energy Act, 42 U.S.C. § 2011, et seq., the Energy Reorganization

---

1. The current storage capacity of each unit is 264 fuel rods. The proposed expansion would increase storage capacity of each unit to 1170 fuel rods. Office of Nuclear Reactor Regulation, Nuclear Regulatory Commission, Environmental Impact Appraisal, at 1.

Act of 1974, 42 U.S.C. § 5801, *et seq.*, and the Council on Environment Quality Guidelines for Preparation of Environmental Statements, 40 C.F.R. Part 1,500 (1973). This case is now before this court upon the defendants' motion to dismiss the complaint. Before reaching the merits of the defendants' motion, the court will review the course of events which brought the litigants to their present positions.

### I. *Technical Background*

The production of nuclear waste material is a concomitant part of the process by which energy is derived from nuclear fission. The fuel with which nuclear reactors are operated is contained in fuel rods, which are placed in the core of the reactor. As the reactor is operated, these fuel rods gradually begin to accumulate radioactive byproducts of the nuclear fission process. When the accumulation of these byproducts reaches the point at which the fuel rods may no longer be utilized efficiently in the nuclear reactor, they are removed from the reactor and replaced by new fuel rods. These exhausted fuel rods, which are commonly referred to as "spent" fuel rods, are then placed in pools of water near the reactor, known as "spent fuel pools" or "SFP's."[2] During the initial period after the spent fuel rods are removed from the reactor, they lose their heat and radioactivity at a rapid rate.[3] The SFP's at the Salem Nuclear Generating Station, like the SFP's at most nuclear power plants, were designed to hold the spent fuel rods during this initial period after the removal of the rods from the reactor core. After this short period of storage, the spent fuel rods would then be removed from the reactor site, for possible reprocessing of the rods to extract some radioactive material which may be used in some activity involving nuclear power, and for the eventual permanent storage of the remaining nuclear waste material.[4] However, this scheme was dependent upon the availability of sufficient facilities for the treatment and disposal of nuclear waste material,[5] and the decision of the federal government to halt the commercial reprocessing of spent nuclear fuel as a result of the fear of plutonium proliferation has aggravated an already growing problem of securing adequate disposal facilities.[6] In response to these nuclear waste disposal difficulties, Public Service, as well as dozens of other operators of nuclear power plants,[7] decided to petition the Nuclear Regulatory Commission ("NRC") for approval of a plan to place new storage racks in its onsite SFP's, which would result in the storage of the spent fuel rods in closer proximity to each other than they are presently stored. This would increase the storage capacity in the existing SFP's and thereby delay the eventual date of reckoning when the nuclear industry must develop a long-term solution to the waste disposal problem which threatens to undermine the safe development of nuclear power.

### II. *Procedural History*

Public Service initiated the proceedings involved in the expansion of its onsite storage facilities by filing an application with the NRC to amend its operating license for Salem Unit # 1 to permit it to use the new storage racks, or to "rerack" as the conversion is referred to in the nuclear industry. Notice of this application was filed in the Federal Register on February 8, 1978. 43 Fed.Reg. 5,443. In response to Public Service's application, the staff of the NRC performed studies of the safety and environmental effects of the proposed reracking, and the NRC invited any interested person to seek leave to intervene and to request a public hearing. The Township of Lower Alloways Creek exercised that op-

2. *Id.*, at 4.

3. *Id.*

4. *See* Environmental Impact Appraisal, at 4.

5. *Id.*, at 1–2.

6. *Id.*, at 2–3.

7. *See* Generic Environmental Impact Statement on Handling and Storage of Spent Light Water Power Reactor Fuel, 1 NUREG–0575 Executive Summary Text (August 1979).

tion and filed the appropriate petition on March 9, 1978.[8] The Atomic Safety and Licensing Board of the NRC granted the township leave to intervene, 43 Fed.Reg. 18,803, and held evidentiary hearings on the proposed amendment to Unit # 1's operating license to permit the requested reracking from May 2 through May 4, 1978. The Atomic Safety and Licensing Board concluded its hearings on this subject on July 11, 1979, and the matter is now pending before the Board for its determination.

Public Service has yet to receive an operating license for Unit # 2 of the Salem Nuclear Generating Station, so it submitted its proposed expansion of that unit's SFP's in the form of an amendment to its application for an operating license. None of the plaintiffs in this action have sought to participate in this licensing proceeding, and the application is now being considered within the scope of the administrative licensing procedure for that unit. 37 Fed.Reg. 22,-637.

Plaintiffs filed this action on April 9, 1979, prior to the commencement of the administrative hearings on the proposed amendment to the operating license for Unit # 1 of the Salem station. The plaintiffs have made many assertions and requests in their complex, highly technical 50 page complaint for declaratory and injunctive relief. However, the heart of the requested relief may be summarized as follows: (1) order the NRC not to authorize Public Service to expand its facilities for the storage of spent fuel rods by constructing new SFP's and racks or by utilizing existing SFP's and racks beyond the current capacity of 264 spent fuel rods per pool; (2) order the NRC to prepare an Environmental Impact Statement on the proposed reracking of the storage facilities; (3) order the NRC to prepare a plan for the ultimate disposal of the spent fuel generated by Units # 1 and # 2 of the Salem Nuclear Generating Station; (4) declare that the NRC's licensing procedures for the expansion of SFP's exceed the NRC's statutory jurisdiction and violate the plaintiffs' first and fifth amendment rights; and (5) declare that the expansion of the SFP's at Units # 1 and # 2 would create an unreasonable risk to the public health and safety.

The defendants have advanced two arguments in support of their motion to dismiss the plaintiffs' complaint. First, the complaint should be dismissed for failure to exhaust the available administrative remedies prior to the commencement of this action. Second, and in the alternative, if the exhaustion doctrine does not bar the plaintiffs from seeking judicial consideration of their challenge to the NRC's actions at this time, then any jurisdiction rests in the court of appeals, not the district court. The court will consider these arguments seriatim.

### III. *The Exhaustion Doctrine*

■ The requirement of exhaustion of administrative remedies prior to the commencement of judicial actions was briefly summarized by the Supreme Court in the case of *Myers v. Bethlehem Shipbuilding Corporation,* 303 U.S. 41, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938). In *Myers* the Court referred to "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Id.,* at 50–51. However, this principle of exhaustion of administrative proceedings before resorting to judicial action is not an absolute, unqualified rule, and state and federal courts, including the Supreme Court, have exer-

---

8. The individual plaintiffs in this action did not seek leave to intervene in the NRC proceedings on the proposal to amend the operating license for Salem Unit # 1. However, the individual plaintiffs are apparently suing in their official and not personal capacities, as reflected in the case caption and their description of the parties in this action, *see* Plaintiffs' complaint, at 4, and as officials of the township they elected to have the township itself intervene in the NRC administrative proceedings on Public Service's proposed licensing amendment. Therefore, the fact that they did not also intervene in the NRC proceedings as individuals does not alter the applicability of the defendants' argument that the complaint should be dismissed based upon the plaintiffs' failure to exhaust their available administrative remedies, as discussed *infra.*

cised jurisdiction over cases in which the litigants have bypassed or not fully exhausted the available administrative remedies. 3 K. Davis, Administrative Law Treatise, §§ 20.01–20.10 (1958), and the cases cited therein. The Supreme Court explicitly recognized that the exhaustion doctrine is a rule of limited application in its opinion in *McKart v. United States,* 395 U.S. 185, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969), in which it observed:

> The doctrine [of exhaustion of administrative remedies] is applied in a number of different situations and is, like most judicial doctrines, subject to numerous exceptions. Application of the doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved.

395 U.S., at 193, 89 S.Ct. at 1662 (footnote omitted).

■ The issue presented to the court by the defendants' exhaustion argument is whether, in the light of the nature of the plaintiffs' claims and the available administrative procedures by which these claims may be heard and remedied, the policies implicated by the exhaustion doctrine would be better served by this court requiring the plaintiffs to pursue all of the existing administrative remedies which may be available or by permitting them to seek judicial consideration of their claims at this time. The consideration of this question should begin with a review of the purposes and functions of the exhaustion doctrine.

The purposes and operation of the exhaustion doctrine were neatly summarized by the Court of Appeals for the Third Circuit in its recent opinion in *First Jersey Securities, Inc. v. Bergen,* 605 F.2d 690 (1979). The court said:

> The primary purpose of this well-established doctrine [of exhaustion of administrative remedies] is "the avoidance of premature interruption of the administrative process," *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969) . . . . Furthermore, the principle allows the administrative agency to utilize its discretion and

apply its expertise; it gives the agency the opportunity to correct its own errors; and it minimizes piecemeal appeals of agency actions. *Parisi v. Davidson,* 405 U.S. 34, 37, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972). "Finally, it is possible that frequent and deliberate flouting of administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures." *McKart v. United States, supra,* 395 U.S. at 195, 89 S.Ct. at 1663; *McGee v. United States,* 402 U.S. 479, 484, 91 S.Ct. 1565, 29 L.Ed.2d 47 (1971); K. Davis, Administrative Law of the Seventies §§ 20.01–20.08 (1976).

605 F.2d, at 695 (footnote omitted). A related concern expressed by the Supreme Court in *McKart* is the judiciary's respect for the independent power and responsibility of the administrative agencies, pursuant to the current application of the constitutional principle of separation of powers. The Court cautioned:

> The administrative agency is created as a separate entity and invested with certain powers and duties. The courts ordinarily should not interfere with an agency until it has completed its action, or else has clearly exceeded its jurisdiction. As Professor Jaffe puts it, "[t]he exhaustion doctrine is, therefore, an expression of executive and administrative autonomy." This reason is particularly pertinent where the function of the agency and the particular decision sought to be reviewed involve exercise of discretionary powers granted the agency by Congress, or require application of special expertise.

395 U.S., at 194, 89 S.Ct. at 1663. The court will now direct its attention to the relevance and weight of these considerations as applied in this case.

The judicial review of the plaintiffs' claims at this time would clearly constitute an interruption of the established administrative process for considering proposed amendments to operating licenses of nuclear power plants. The proceeding before the NRC began with the filing of an application for an amendment of the license of Salem

Unit # 1, 10 C.F.R. § 2.101 (1978), and the township's involvement commenced with its successful motion to intervene in these proceedings. 10 C.F.R. § 2.714. As the court has already noted, the administrative disposition of this proposed amendment is now pending before the Atomic Safety and Licensing Board. If that Board issues a ruling which is adverse to the position of the plaintiffs, it will not constitute final action by the NRC unless the aggrieved party fails to file a timely exception to the Board's ruling. 10 C.F.R. §§ 2.760, 2.762. The plaintiffs' exceptions would then be heard by the Atomic Safety and Licensing Appeal Board, 10 C.F.R. § 2.785, and if the plaintiffs failed to prevail before the Appeals Board, they might petition the NRC to review the Appeals Board's decision on the ground that its decision was "erroneous with respect to an important question of fact, law, or policy." 10 C.F.R. § 2.786. A decision by this court to hear the plaintiffs' action at this time, when the plaintiffs have not waited to hear what the initial decision-maker in the administrative proceedings would decide, let alone to exhaust the available opportunities to change an adverse decision within the agency before it becomes a final agency action, would sanction the blatant disregard of the administrative procedures, thereby depriving the agency of the opportunity to shape its policies and to exercise its expertise. In the absence of more pressing countervailing considerations, that course of action should be avoided by this or any other court which must operate from the fundamental premise that the judiciary has a significant but limited role in the governing process. Moreover, if the plaintiffs were required to exhaust the administrative remedies before resorting to the judicial remedies, it might, at a minimum, serve to lay a better foundation for the eventual judicial consideration of the significant issues by framing the questions which the court must decide, and could lead to the harmonious resolution of the dispute between the parties before the court commences its separate proceedings.

Another significant consideration in determining whether to hear the plaintiffs'

legal claims at this time is the impact this would have on the resolution of the substantive issue disputed in this case; namely, the proper handling and management of the spent fuel generated by the Salem nuclear reactors. In response to the decision of the Court of Appeals for the District of Columbia Circuit in *Minnesota v. NRC*, 602 F.2d 412 (1979), the NRC is planning to conduct a generic proceeding

> to reassess its degree of confidence that radioactive wastes produced by nuclear facilities will be safely disposed of, to determine when any such disposal will be available, and whether such wastes can be safely stored until they are safely disposed of.

44 Fed.Reg. 61,372–73 (1979). However, the practical importance of this procedure has been reduced by the fact that the NRC declared in its notice of proposed rulemaking:

> During this proceeding the safety implications and environmental impacts of radioactive waste storage on-site for the duration of a license will continue to be subjects for adjudication in individual facility licensing proceedings. The Commission has decided, however, that during this proceeding the issues being considered in the rulemaking should not be addressed in individual licensing proceedings. These issues are most appropriately addressed in a generic proceeding of the character here envisaged.

44 Fed.Reg. 61,373 (1979).

IV. *The Exceptions to the Exhaustion Requirement*

■ Although these considerations militate in favor of a decision by this court to mandate that the plaintiffs exhaust the available administrative procedures before considering their judicial action, the plaintiffs have made a few arguments suggesting that this is not an appropriate case for the application of the principle of exhaustion of administrative remedies. Those arguments challenging the application of the exhaustion doctrine may be evaluated in the light of the exceptions to the exhaus-

tion doctrine recognized in this Circuit. *First Jersey Securities, Inc.,* 605 F.2d, at 696.

### A. *Clear and Unambiguous Statutory or Constitutional Violations*

One reason the plaintiffs have offered to excuse their failure to exhaust the available administrative procedures before resorting to judicial action is that their suit involves allegations that the NRC's present or proposed conduct violates certain statutory and constitutional requirements which they contend govern the NRC's consideration of Public Service's proposal to expand the SFP's at the Salem station. The plaintiffs state that their claims involve a challenge to fundamental agency policies and procedures, and it would not be advisable for this court to require exhaustion of the available administrative procedures to raise these issues. They contend the NRC is unlikely to look favorably upon these challenges to its policies and practices and that an administrative agency is not an appropriate forum for considering such a constitutional challenge.

The plaintiffs have made a variety of statutory claims in their complaint for injunctive and declaratory relief, including: (1) a request for declaratory judgment that the expansion of the SFP's by reracking Units # 1 and # 2 contravenes the mandate of the Energy Sources Development Act that the NRC insure the safe, permanent disposal of high level radioactive waste by means of the licensing process; (2) a request for an order directing the NRC to prepare an Environmental Impact Statement concerning the proposed expansion of the SFP's and the resulting increased storage of spent fuel rods, pursuant to the National Environmental Policy Act; and (3) the request for an order directing the NRC to provide a plan for the ultimate disposal of spent fuel generated by Units # 1 and # 2 of the Salem station, also pursuant to the National Environmental Policy Act. In addition to their statutory claims, the plaintiffs have claimed that the NRC's alleged failure to follow the procedures which they contend are mandated by the National Environmental Policy Act have resulted in violations of their fifth amendment right to due process and of the individual plaintiffs' first amendment right of free speech. Whether these allegations of statutory and constitutional violations justify plaintiffs' failure to exhaust the available administrative procedures shall now be examined.

The courts will excuse a party's failure to exhaust the available administrative procedures "when there is a clear and unambiguous statutory or constitutional violation." *First Jersey Securities, Inc.,* 605 F.2d, at 696. However, under this exception to the exhaustion requirement

> a mere allegation of a constitutional deprivation is insufficient to entitle the plaintiff to relief. *See Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 771–72, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947); *Montana Chapter of Association of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165, 1167 (9th Cir. 1975); *Wallace v. Lynn,* 165 U.S.App.D.C. 363, 507 F.2d 1186 (D.C.Cir.1974). The plaintiff must present a clear ·and unambiguous constitutional violation by the agency. *See Barnes v. Chatterton, supra,* 515 F.2d [916] at 920.

*First Jersey Securities, Inc.,* 605 F.2d, at 697. Therefore, the court must now decide whether the plaintiffs have met the requirement of showing a "clear and unambiguous" statutory or constitutional violation.

 It is difficult to provide a precise definition of what constitutes a "clear and unambiguous" violation of a statutory or constitutional directive. A brief description of what constitutes a "clear and unambiguous" violation was provided in *Fitzpatrick v. Snyder,* 220 F.2d 522, 526 (1st Cir. 1955), *cert. denied,* 349 U.S. 946, 75 S.Ct. 875, 99 L.Ed. 1272 (1955), which has been applied in this Circuit. *American ·Federation of Government Employees Local 1904 v. Resor,* 442 F.2d 993, 996 (3rd Cir. 1971). In *Fitzpatrick* the Court of Appeals declined to apply this exception to the exhaustion requirement where the plaintiff, an honorably dis-

charged veteran who brought this action to enjoin his separation from employment at a naval shipyard pursuant to a reduction in force at that facility,

> has not shown . . . that his separation is in violation of a clear statutory right to be retained, that is to say, that the Regulation of the Civil Service Commission under which he was ordered separated is *patently at variance* with the clear provisions of § 12 of the Veterans Preference Act of 1944.

*Fitzpatrick,* 220 F.2d, at 526 (emphasis added). However, even this "patently at variance" definition provides little practical guidance as to what must be shown to establish the requisite clear and unambiguous violation. Therefore, this court feels compelled to expound upon that definition of what constitutes a "clear and unambiguous" violation, in order to provide a more objective standard for determining whether a particular litigant has made the requisite showing. The court would find that a party has satisfactorily shown a "clear and unambiguous" violation for the purpose of excusing that party's failure to exhaust the available administrative remedies if that party's presentation of his claim of alleged statutory or constitutional violations would have been sufficient to merit a decision to enter judgment in favor of that party as a matter of law, in the absence of any defense, such as the statute of limitations, which does not concern the substantive merits of that party's claim. The court will apply this test to the plaintiffs' statutory and constitutional claims.

The plaintiffs' claims of statutory and constitutional violations raise a few basic issues, including: (1) would a decision by the NRC to permit Public Service to rerack its SFP's to increase the onsite waste storage capacity be inconsistent with the NRC's statutory duty to ensure the safe, permanent disposal of nuclear waste through the licensing process; (2) is the proposed reracking a substantial action affecting the environment such that the NRC should issue a new Environmental Impact Statement on the proposed reracking and expansion of nuclear waste storage capacity; (3)

is the NRC required by the National Environmental Policy Act to prepare a plan for the ultimate disposal of the spent fuel generated by the Salem station; (4) do the NRC's procedures for the consideration of the proposal to rerack the SFP's violate the fifth amendment's guarantee of due process; and (5) do the NRC procedures violate the individual plaintiffs' first amendment right of free speech. Even a cursory examination of these issues indicates that the allegations of statutory and constitutional violations are not so readily resolved that this court is able to declare that the present or contemplated actions of the NRC are "patently at variance" with the applicable statutory and constitutional requirements and that the plaintiffs would be entitled to the entry of judgment in their favor as a matter of law. On the contrary, these claims inextricably involve issues of agency expertise and discretion, as well as questions of statutory and constitutional interpretation. Therefore, this court must conclude that the plaintiffs have not shown a "clear and unambiguous" statutory or constitutional violation which would excuse their failure to exhaust the available administrative remedies. However, the court notes that its determination that the plaintiffs have not established a "clear and unambiguous" violation does not constitute a ruling on the merits of the plaintiffs' statutory and constitutional claims. Rather, it is a preliminary determination which is only relevant to the court's decision as to whether a court will hear the plaintiffs' claims *now,* instead of waiting until after the plaintiffs have exhausted the administrative proceedings and *then* seek judicial review of the agency's actions.

The plaintiffs' contention that the presence of these constitutional questions justifies their failure to exhaust the available administrative remedies merits particular comment. This precise argument was addressed by the Court of Appeals in *Montana Chapter of Association of Civilian Technicians, Inc. v. Young,* 514 F.2d 1165, 1167–68 (9th Cir. 1975), in which the court stated:

the doctrine of exhaustion of administrative remedies is not prevented from being applied solely by the fact the party applying for judicial relief urges a violation of rights secured by the federal constitution. Where relief may be granted on other nonconstitutional grounds, exhaustion is required. *See Aircraft & Diesel Equipment Corp. v. Hirsch,* 331 U.S. 752, 772–773, 67 S.Ct. 1493, 91 L.Ed. 1796 (1947). The necessity of deciding the constitutional issues may well be avoided by the grant of alternative administrative relief. . . . As the Supreme Court stated in *Aircraft & Diesel Equipment Corp. v. Hirsch,* supra:

> "[T]he very fact that constitutional issues are put forward constitutes a strong reason for not allowing this suit either to anticipate or to take the place of [a final judicial or administration procedure]. When that has been done it is possible that nothing will be left of appellants' claim . . . ." 331 U.S. at 772, 67 S.Ct. at 1503.

The plaintiffs in this action have made both statutory and constitutional claims and it is possible that they could achieve their goal of preventing the reracking of the SFP's even if this court did not reach the constitutional claims. Therefore, the incorporation of some constitutional claims in their complaint for injunctive and declaratory relief should not serve to excuse their failure to exhaust the available administrative procedures, since the results of the administrative proceedings might obviate the need for any judicial consideration of the plaintiffs' claims. Consequently, the court must reject the plaintiffs' argument that they have shown the requisite statutory or constitutional violation which would justify their failure to exhaust the available administrative remedies.

B. *Inadequate Procedures to Prevent Irreparable Injury*

The other class of the plaintiffs' objections to the application of a requirement that they exhaust all available administrative procedures concerns the adequacy of the remedy afforded by the NRC's adminis-

trative procedures. Under an established exception to the exhaustion doctrine, a party will not be required to satisfy the exhaustion requirement "when the administrative procedure is clearly shown to be inadequate to prevent irreparable injury." *First Jersey Securities, Inc.,* 605 F.2d, at 696. The plaintiffs contend that their action should fall within this exception to the exhaustion doctrine since their lawsuit allegedly concerns matters which may not be addressed in the administrative procedures afforded by the NRC. In support of this argument, the plaintiffs seek to characterize the administrative procedures as ineffective vehicles for considering their claims. They assert that in the

> pending procedure before the Nuclear Regulatory Commission . . . all of the plaintiffs' contentions dealing with matters of safety and health were rejected and the only contention before the Atomic Safety and Licensing Board in that procedure is whether the applicant has adequately investigated the feasibility of storing the spent fuel generated by Salem Unit # 1 at an independent spent fuel storage installation in a dry unpopulated climate.
>
> The Township of Lower Alloways Creek has no remedy in respect to the enlargement of spent fuel storage capacity at Salem Unit # 2 in that Salem # 2 has not yet received an operating license.

Plaintiff's Brief, at 10. In contrast, the plaintiffs characterize the present lawsuit as one addressing discrete issues which are not touched upon in the administrative proceedings. They state:

> The Township of Lower Alloways Creek is not raising any issue in respect to problems concerning the uncertainty and/or feasibility of the ultimate solution for the disposal of spent fuel. Instead, the Township of Lower Alloways Creek has raised very narrow issues in its complaint dealing with accident hazards and the inadequate safety and environmental evaluations performed by the Nuclear Regulatory Commission in respect to the storing of large amounts of spent fuel in

reracked spent fuel pools in close proximity to operating nuclear reactors.

*Id.,* at 13.

Although these statements are not completely incorrect, they serve to create an incomplete and misleading impression of the nature and function of both proceedings, which would frustrate an evaluation of the adequacy of the administrative remedies. First of all, the plaintiffs state that all of their contentions relating to health and safety concerns "were rejected" by the NRC. This is not an accurate description of either the substantive or procedural actions taken by the NRC. What did happen was that the Office of Nuclear Reactor Regulation prepared an environmental impact appraisal concerning the modification of the SFP's at Unit # 1 of the Salem station. Defendants' Brief, app. A. This environmental impact appraisal considered the environmental impact of the proposed action of Public Service and concluded that "the expansion of the storage capacities of the Unit 1 or the Unit 2 SFP would not result in any significant unavoidable adverse environmental impacts on the land, water, air or biota of the area." *Id.,* at 20. This study also specifically considered the environmental impact of "Postulated Accidents" which may occur at the Salem facility if Public Service reracked its SFP's. The report concluded that "the installation and use of the [new] racks will not change the radiological consequences of a postulated fuel handling accident in the SFP area" from those values reported in an earlier evaluation of Salem Units # 1 and # 2, and that "no additional restrictions on load handling operations in the vicinity of the SFP will be necessary as a result of these proposed modifications." *Id.,* at 12. This Environmental Impact Appraisal did not bar the township from continuing to raise these health and safety concerns in the administrative proceedings before the Atomic Safety and Licensing Board in the hearings which it held, nor did it foreclose the township from raising this issue in any subsequent administrative appeal of an adverse decision of the Atomic Safety and Licensing Board to the Appeals Board.

The plaintiffs' characterization of the administrative and judicial proceedings is also misleading in its implication that these two proceedings concern wholly distinct and different issues. The plaintiffs are technically correct when they state that their complaint does not raise the issue of the availability of an "ultimate" solution to the general problems related to the disposal of spent nuclear fuel. However, their complaint does address closely related aspects of the waste disposal issue. In their complaint the plaintiffs are asking this court: (1) to issue a declaratory judgment to the effect that the proposal of Public Service to expand the storage capacity of the Salem station by reracking the SFP's at Units # 1 and # 2 is beyond the jurisdictional authority of the NRC and in contravention of its statutory mandate to ensure the safe, permanent disposal of high level radioactive waste through the licensing process; and (2) to order the NRC to provide a plan for the ultimate disposal of the spent fuel generated at Salem Units # 1 and # 2, pursuant to the National Environmental Policy Act. Plaintiffs' Complaint, at 2. The former request raises questions of health and safety, which may be addressed in the NRC administrative proceedings. The latter request, which involves the problem of developing plans for the "ultimate disposal" of the spent fuel generated by the Salem station, raises issues of general concern which may be addressed in either the generic or the individual licensing proceedings. Therefore, the court must reject the plaintiffs' argument that their complaint raises issues which may not be adequately addressed in the NRC administrative proceedings and that the different focus of the administrative and judicial proceedings justifies the plaintiffs' failure to exhaust the available administrative proceedings.

The plaintiffs' contention that they have no administrative remedy with respect to Salem Unit # 2 merits separate comment by the court. The plaintiffs could have had an administrative forum for expressing their objections to the proposed expansion of the storage capacity of Unit # 2 if they

had sought to participate in the initial proceedings related to Public Service's application for an operating license for that unit. The Regulations governing NRC proceedings provide that a person may petition for leave to intervene in the proceedings and to be treated as a party if he makes a timely filing after the notice of the proceeding is published in the Federal Register. 10 C.F.R. § 2.714. Moreover, if that petition to intervene is not granted, a person may promptly appeal that decision to the Atomic Safety and Licensing Board, 10 C.F.R. § 2.714a, and might even be permitted to make a limited appearance in the NRC proceedings if he is not a party to the proceedings. 10 C.F.R. § 2.715. The plaintiffs did not avail themselves of the known opportunity to intervene in the licensing proceedings for Unit # 2 and cannot now argue that the currently available administrative remedies are inadequate as a result of their own inaction. 3 K. Davis, *supra,* § 20.07, at 99.

However, the plaintiffs' argument that the available administrative proceedings are inadequate to prevent irreparable injury takes on new significance when viewed in the context of the NRC's regulations governing the enforcement of administrative decisions. 10 C.F.R. § 2.764 states:

*Immediate effectiveness of initial decision directing issuance or amendment of construction permit or operating license.*

(a) An initial decision directing the issuance or amendment of a construction permit, a construction authorization, or an operating license shall be effective immediately upon issuance unless the presiding officer finds that good cause has been shown by a party why the initial decision should not become immediately effective, subject to the review thereof and further decision by the Commission upon exceptions filed by any party pursuant to § 2.762 or upon its own motion.

(b) The Director of Nuclear Reactor Regulation or Director of Nuclear Material Safety and Safeguards, as appropriate, notwithstanding the filing of exceptions, shall issue a construction permit, a construction authorization, or an operating

license, or amendments therefor, authorized by an initial decision, within ten (10) days from the date of issuance of the decision.

If the proposals to rerack the SFP's at Units # 1 and # 2 of the Salem station receive agency approval at the initial level of administrative proceedings and the appropriate officials decide to make these decisions immediately effective, this could lead to the rapid replacement of the old spent fuel racks with the new racks and could result in an increase in the amount of fuel stored in the SFP's beyond the capacity permitted by the old fuel racks. In light of the difficulty in obtaining offsite waste disposal sites, which precipitated the decision of Public Service to request permission to rerack its SFP's to increase their storage capacity, the decision to authorize Public Service to rerack its SFP's immediately, despite the pendency of appeals within the agency and in the courts, could inflict serious irreparable injury to the plaintiffs' asserted interests which might not be able to be corrected in the subsequent agency and judicial proceedings. This course of events could excuse the plaintiffs' failure to exhaust their administrative remedies, and a court of competent jurisdiction could enjoin the NRC from enforcing that decision until the aggrieved plaintiffs are able to complete their administrative appeals and obtain judicial review on the merits of the agency's decision. This leads to the question of which court would have jurisdiction if the administrative proceedings did result in a decision to authorize Public Service to rerack its SFP's immediately.

V. *The Jurisdictional Question*

If the decision which was made in these administrative proceedings constituted a "final order" of the NRC, then the court of appeals would have jurisdiction to enjoin or suspend the enforcement of that decision. 42 U.S.C. § 2239, 28 U.S.C. § 2342. However, if the court of appeals declined to exercise jurisdiction over a motion to enjoin the enforcement of the administrative decision to give immediate authorization for the reracking of the SFP's on the ground such administrative decision was not a "final or-

der" in terms of that court's appellate jurisdiction over final agency actions, then this court would have jurisdiction over the plaintiffs' claims under its general federal question jurisdiction, 28 U.S.C. § 1331. *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); Note, *Jurisdiction to Review Federal Administrative Action: District Court or Court of Appeals,* 88 Harv.L.Rev. 980, 983–87 (1975).

■ If the plaintiffs are going to be required to exhaust the available administrative proceedings before seeking judicial review of the agency's decisions, then the agency must be required to permit the plaintiffs to pursue the available administrative and judicial appeals without subjecting them to fundamental and irreparable harm as a result of the agency's desire to give immediate effect to its administrative decisions. The court understands and sympathizes with the agency's concern about delaying the enforcement of its decisions pending the exhaustion of what may seem to be lengthy legal appeals. However, delay and the costs which it inflicts upon the agency, the parties to the proceedings, and the public at large, are part of the price of a system of laws which must afford due process to all litigants, and that must include all necessary efforts to ensure that they are afforded their day in court at a time when judicial action can give the parties all of the remedies which they may deserve. Therefore, the court notes that it would view any attempt to permit Public Service to rerack its SFP's before the plaintiffs are afforded all the administrative and judicial consideration to which they are entitled as a threatened violation of the plaintiffs' right of due process which may be enjoined.

The court need not address the more general question as to whether the plaintiffs should have brought this action for injunctive and declaratory relief in the district court or the court of appeals in light of its decision today that the plaintiffs must exhaust the available administrative remedies, at least until a decision contrary to their position is made in the NRC proceedings and the NRC attempts to give that decision immediate effect.

## VI. *Conclusion*

■ To sum up, the court will dismiss the plaintiffs' complaint for injunctive and declaratory relief based upon their failure to exhaust the available administrative proceedings. However, if in the course of those administrative proceedings, Public Service's request to amend the operating license for Salem Unit # 1 or its amended application for an operating license for Salem Unit # 2 is granted and given immediate effect, despite the pendency of administrative or judicial appeals, and if the court of appeals determines that it does not have jurisdiction to hear the plaintiffs' claims at that time on the ground that it is beyond its appellate jurisdiction, then this court will exercise its jurisdiction to hear the plaintiffs' claims. The court may hear the plaintiffs' claims at that time even if the plaintiffs will not have exhausted all of their administrative remedies, since it may be necessary to prevent irreparable injury to the plaintiffs' interests and to afford them due process at a meaningful time.