799 F.2d 1268
 17 Envtl. L. Rep. 20,011
 SAN LUIS OBISPO MOTHERS FOR PEACE and the Sierra Club, Petitioners,
v.
UNITED STATES NUCLEAR REGULATORY COMMISSION, and the United
States of America, Respondents,
and
Pacific Gas and Electric Company, Respondent-Intervenor.
 No. 86-7297.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 13, 1986.
Decided Sept. 11, 1986.
 
 Edwin F. Lowry, Dian M. Grueneich, Grueneich & Lowry, San Francisco, Cal., for petitioners.
 Edwin Meese, III, U.S. Dept. of Justice, William H. Briggs, Jr., Nuclear Regulatory Com'n, Richard K. Willard, Dept. of Justice, C. Sebastian Aloot, Nuclear Regulatory Com'n, Washington, D.C., for respondents.
 Richard F. Locke, Pacific Gas & Electric Co., San Francisco, Cal., Bruce Norton, Norton, Berry, French & Perkins, Phoenix, Ariz., for respondent-intervenor.
 Petition to Review a Decision of the United States Nuclear Regulatory Commission.
 Before MERRILL, NELSON and WIGGINS, Circuit Judges.
 NELSON, Circuit Judge:
 
 
 1
 San Luis Obispo Mothers for Peace and the Sierra Club (petitioners) challenge an order of the Nuclear Regulatory Commission (NRC) granting operating license amendments for Units 1 and 2 of the Diablo Canyon Nuclear Power Plant (Diablo Canyon). The license amendments permit Pacific Gas & Electric Company (PG & E) to expand the capacity of the on-site radioactive spent fuel storage pools at Diablo Canyon. The NRC found that the license amendments involved "no significant hazards consideration" and made them immediately effective without prior public hearings. Because the NRC violated its own regulations in finding no significant hazards consideration with respect to the Diablo Canyon amendments, we reverse this finding and remand to the NRC for the public hearings contemplated by the Atomic Energy Act.
 
 BACKGROUND
 
 2
 Nuclear reactors are operated with fuel contained in rods that are placed in the core of the reactor. As the reactor is operated, radioactive byproducts gradually accumulate in the fuel rods. Eventually, the rods must be removed from the reactor and replaced. The exhausted fuel rods, known as "spent" fuel rods, are placed in pools of water near the reactor. After a period of storage near the reactor, the rods are removed for some other form of permanent waste disposal. See generally Lower Alloways Creek Township v. United States Nuclear Regulatory Commission, 481 F.Supp. 443, 445 (D.N.J.1979).
 
 
 3
 Under PG & E's original licenses for Diablo Canyon, spent nuclear fuel rods were to be stored on stationary racks secured to the bottom of two pools filled with water, one pool for each of the two units at the plant. Each pool contained racks with 270 spent fuel assembly spaces. PG & E's amended license allows the storage of the spent fuel rods in free-standing racks not anchored to the base of the pools that contain 1324 spent fuel assembly spaces in each pool. The change in the configuration of the racks in the pools is referred to as "reracking."
 
 
 4
 In October 1985, PG & E requested license amendments to permit reracking of the pools. The need for increased storage capacity seems to have been caused by the realization that federal storage facilities for spent nuclear fuel rods would not be available until at least 1998. Under the old configuration of the pools, Diablo Canyon's storage capacity would be exhausted by 1990.
 
 
 5
 In January 1986, the NRC published a notice of these proposed amendments to the Diablo Canyon licenses. This notice included a proposed no significant hazards consideration determination. Petitioners timely intervened and requested a hearing. On May 30, 1986, prior to any hearings and based on a staff finding of no significant hazards consideration, the NRC approved the proposed license amendments and made them immediately effective. PG & E began reracking the pool for Unit 1 the next day.
 
 
 6
 Petitioners then sought stays from both the NRC and this court. On July 2, this court enjoined the reracking of Unit 2 and permitted PG & E to proceed with the reracking on Unit 1 at its own risk. The court further ordered that PG & E not use the pool for the storage of radioactive nuclear waste pending further order of the court.
 
 
 7
 On July 22, the NRC modified its May 30 order in response to petitioners' stay request. The NRC order now permits reracking of the spent fuel pools prior to the hearing petitioners have requested, but prohibits PG & E from storing more spent fuel in the pools than authorized by the original licenses until the conclusion of the hearing. On August 5, 1986, petitioners amended their petition for review to include the NRC's latest order.
 
 ANALYSIS
 
 8
 Section 189(1)(a) of the Atomic Energy Act, 42 U.S.C. Sec. 2239(a)(1) (1986 Supp.), sets forth the hearing framework for the amendment of licenses for nuclear power plants. The Act provides that "[i]n any proceeding ... for the granting, suspending, revoking, or amending of any license ..., the Commission shall grant a hearing upon the request of any person whose interest may be affected by the proceeding, and shall admit any such person as a party to such proceeding." Id. (emphasis added). The hearing shall be held after thirty days' notice and publication in the Federal Register. The NRC "may dispense with such thirty days' notice and publication ... upon a determination by the Commission that the amendment involves no significant hazards consideration." Id.
 
 
 9
 Prior to 1980, if the NRC staff found that a license amendment presented no significant hazards consideration, the staff issued the amendment without notice or an opportunity for a prior hearing. 42 U.S.C. Sec. 2239(a) (1962) (amended 1983). In Sholly v. Nuclear Regulatory Commission, 651 F.2d 780 (D.C.Cir.1980), vacated to consider mootness, 459 U.S. 1194, 103 S.Ct. 1170, 75 L.Ed.2d 423 (1983), the District of Columbia Circuit held that the NRC could not make an amendment immediately effective in this manner if there was an outstanding request for a hearing. This decision prompted an amendment to Section 189(a), enacted in 1983, known as the "Sholly" amendment. This amendment provides, in pertinent part, that:
 
 
 10
 The Commission may issue and make immediately effective any amendment to an operating license, upon a determination by the Commission that such amendment involves no significant hazards consideration, notwithstanding the pendency before the Commission of a request for a hearing from any person. Such amendment may be issued and made immediately effective in advance of the holding and completion of any required hearing. In determining under this section whether such amendment involves no significant hazards consideration, the Commission shall consult with the State in which the facility involved is located. In all other respects such amendment shall meet the requirements of this chapter.
 
 
 11
 42 U.S.C. Sec. 2239(a)(2)(A). The amendment also provides that the NRC shall promulgate detailed regulations for making a no significant hazards consideration determination. 42 U.S.C. Sec. 2239(a)(2)(C).
 
 
 12
 Under the NRC's regulations, the NRC may make a license amendment immediately effective only if the amendment does not:
 
 
 13
 (1) Involve a significant increase in the probability or consequences of an accident previously evaluated; or
 
 
 14
 (2) Create the possibility of a new or different kind of accident from any accident previously evaluated; or
 
 
 15
 (3) Involve a significant reduction in a margin of safety.
 
 
 16
 10 C.F.R. Sec. 50.92. Although the NRC did consider these amendments in accordance with the form of the regulations set forth above, its analysis of the second standard is contradictory and in direct contravention of Congressional intent in enacting the Sholly amendment.
 
 
 17
 The Conference Committee Report accompanying the Sholly amendment, which is entitled to great weight in analyzing Congressional intent, see American Jewish Congress v. Kreps, 574 F.2d 624, 629 n. 36 (D.C.Cir.1978), expressly states that the implementing regulations "should ensure that the NRC staff does not resolve doubtful or borderline cases with a finding of no significant hazards consideration." House Conference Report No. 97-884, at p. 37, reprinted in 1982 U.S.Code Cong. & Ad.News 3592, 3607. The Conference Committee Report further states that the standards "should not require the NRC staff to prejudge the merits of the issues raised by a proposed license amendment." Id. The regulations thus appropriately require a hearing before the proposed license amendment becomes effective whenever the amendment creates the possibility of a new or different kind of accident. Petitioners have identified such an accident and they should have been granted a prior hearing.
 
 
 18
 The change from racks bolted to the floor of the pools to free-standing racks creates the possibility that, in the event of an earthquake, the racks will collide with the walls of the pools or with each other, enhancing the risk of a nuclear reaction occurring in the pools. Diablo Canyon is located in an active seismic zone and the original Diablo Canyon licenses did not analyze the effect of an earthquake on this new rack design. The license amendments thus would seem to create the possibility of a new or different kind of accident.
 
 
 19
 The NRC does not deny that the specific kinds of accidents petitioners identify--racks colliding with each other and with the walls of the pools--were not analyzed in connection with the original licenses. The NRC also admits that petitioners' claims are sufficiently serious to justify a later hearing. At the same time, however, the NRC seeks to support its finding of no significant hazards consideration by a technical analysis of why petitioners' claims lack merit. See NRC Memorandum and Order dated July 22, 1986, at 12-15. The NRC attacks certain of the assumptions underlying petitioners' contentions and concludes that the new racks "have been designed to meet the seismic force requirements previously applied to the originally intended bolted racks." Id. at 13. The NRC's arguments amount to an assertion that, because the possibility of a nuclear reaction occurring in the pools in the event of an earthquake was analyzed in connection with the original operating licenses, and because the NRC staff is satisfied that the new racks will not increase the possibility of a nuclear reaction occurring in the pools in the event of an earthquake, no new or different kind of accident is implicated by the amendments.
 
 
 20
 The very process by which the NRC attempts to rebut petitioners' contentions constitutes a tacit admission that the amendments do create the possibility of a new or different kind of accident. The claims are at least serious enough to warrant a later hearing. The NRC's own regulations require that a hearing be held before the amendments are made effective when there is a possibility of a new or different kind of accident. These regulations are in accordance with the Congressional directive that doubts be resolved in favor of a prior hearing and that the NRC staff not prejudge the merits of a proposed license amendment. A prior hearing is required in this case.
 
 
 21
 Because we find the NRC's action to have been impermissible under its own regulations, we need not reach petitioners' additional arguments concerning the Atomic Energy Act, the Nuclear Waste Policy Act, and the National Environmental Protection Act (NEPA). With respect to petitioners' NEPA claims, however, we note that the site specific environmental assessment was based on a seven year old generic environmental assessment and that no worst case analysis, 40 C.F.R. Sec. 1502.22, appears to have been conducted. We strongly suggest that any doubt concerning the need to supplement the NEPA documents be resolved in favor of additional documentation.
 
 CONCLUSION
 
 22
 The NRC failed to comply with its own regulations in denying petitioners a hearing prior to making the Diablo Canyon reracking license amendments effective. Accordingly, the existing stay of those amendments is continued. PG & E shall not deposit any spent fuel rods in the pool for Unit 1 and shall not rerack the pool for Unit 2 until hearings have been held in compliance the requirements of the Atomic Energy Act.[1]
 
 
 23
 REVERSED AND REMANDED.
 
 
 24
 WIGGINS, Circuit Judge, will file his views separately.
 
 
 
 [1]
 PG & E may, of course, elect to return the racks to the original configuration in accordance with its existing operating licenses and may then use the spent fuel pools prior to completion of the hearings